## SWANN *v.* SWANN.

*(Circuit Court, E. D Arkansas.* April Term, 1884.)

1. STATE LAWS—UNITED STATES COURTS—JUDICIAL NOTICE.

     The circuit courts of the United States take judicial notice of the laws of the several states.

2. CONTRACTS VALID WHERE MADE, VALID EVERYWHERE—EXCEPTIONS.

     The general rule is that a contract valid by the law of the place where it is made is valid everywhere; but there are exceptions to this rule, and, among them, contracts against good morals, and that tend to promote vice and crime, and contracts against the settled public policy of the state, will not be enforced, although they may be valid by the law of the place where they are made.

3. LORD'S DAY CONTRACTS—VALID IN TENNESSEE, WHEN.

     In Tennessee isolated private contracts made on the Lord's day, outside of the ordinary calling of the parties to them, are valid.

4. SAME—ARKANSAS RULE.

     *Prima facie,* contracts made in Arkansas on the Lord's day are void; but contracts made in that state, on that day, between parties who observe as a day of rest any other day of the week, agreeably to the faith and practice of their church or society, are valid.

5. SAME—COMMON LAW.

     At the common law, contracts made on the Lord's day were as valid as those made on any other day.

6. PUBLIC POLICY—HOW ASCERTAINED.

     The only authentic and admissible evidence of the public policy of a state, on any given subject, are its constitution, laws, and judicial decisions.

7. LORD'S DAY ACTS—POLICE REGULATIONS.

     The Lord's day acts are not religious regulations; they are a legitimate exercise of the police power, and are themselves police regulations.

8. LORD'S DAY CONTRACTS—UPON WHAT GROUNDS VOID.

     Contracts made on the Lord's day are not void on religious or moral grounds, but upon the familiar and established doctrine that when a statute inflicts a penalty for doing an act,—no matter what that act may be,—a court of justice will not enforce a contract made in violation of such statute, and in the making of which the parties to it incurred the prescribed penalty. A penalty implies a prohibition of the thing itself, on the doing of which the penalty is to accrue.

9. SAME—WHEN ENFORCED.

     When, by the laws of a state, a large class of its citizens may lawfully labor and make contracts on the Lord's day, it is not, in a legal sense, against the public policy of such state, nor shocking to the moral sense of its people, for its courts to enforce a contract made on that day in another state, and valid by the law of that state.

10. SAME—VALID WHERE MADE, ENFORCED EVERYWHERE.

     A contract made on the Lord's day, and valid by the law of the state where made, will be enforced by the courts of another state, by the laws of which such contract would be void.

At Law.

*Ratcliff & Fletcher,* for plaintiff.

*Clark & Williams,* for defendant.

CALDWELL, J. This suit is founded on a promissory note of which the defendant is the maker and the plaintiff the payee. The defense is that the note was executed on the Lord's day. The proof shows the note was executed on that day in the state of Tennessee, where the parties to it then resided, for the consideration of a valid pre-

existing debt due from the defendant to the plaintiff. There is no place of payment fixed in the note.

In *Tucker* v. *West*, 29 Ark. 386, a note executed in this state on the Lord's day was held to be void under the statute. This court takes judicial notice of the laws of the several states. *Owings* v. *Hull*, 9 Pet. 607; *Railroad Co.* v. *Bank of Ashland*, 12 Wall. 226.

By the law of Tennessee, where the note was executed, it is a valid obligation. In *Amis* v. *Kyle*, 2 Yerg. 31, the supreme court held that the statute of that state only prohibited labor and business in the "ordinary calling" of the parties; and that isolated private contracts, made by parties outside of their ordinary calling, are not invalidated. This rule was carried to a great length in the case cited. An obligation, to be discharged in horses, was made payable on the Lord's day, and the court held the contract valid, and that a tender of the horses, to have the effect of discharging the obligation, must be made on that day. This was held upon the ground that the sale and delivery of horses was not the ordinary calling of either of the parties. The attention of the court has not been called to any later exposition of the law of that state than is contained in this decision, and it will be assumed that there is none.

Under the rule established in *Amis* v. *Kyle*, it is obvious the note, which is the foundation of this suit, was valid in Tennessee. The execution of a note for a pre-existing debt was probably not the ordinary calling of either of the parties. If it was, the burden of proof was on the defendant to show it. *Roys* v. *Johnson*, 7 Gray, 162; *Bloxsome* v. *Williams*, 3 Barn. & C. 232. The doctrine of the supreme court of Tennessee is the doctrine of the early English cases under the statute of 29 Chas. II. *c.* 7, which prohibited labor only in the "ordinary calling" of the parties. *Drury* v. *Defontaine*, 1 Taunt. 131; *Bloxsome* v. *Williams*, *supra*; *Rex* v. *Whitnash*, 7 Barn. & C. 596; *Fennell* v. *Ridler*, 5 Barn. & C. 406; *Rex* v. *Brotherton*, 2 Strange, 702. It is also the doctrine of some of the American cases. *Hellams* v. *Abercrombie*, 15 S. C. 110; *Bloom* v. *Richards*, 2 Ohio St. 387; *George* v. *George*, 47 N. H. 27; *Hazard* v. *Day*, 14 Allen, 487. Of course, the law of this state has no extraterritorial operation, and cannot affect the validity of contracts executed elsewhere on the Lord's day. And the general rule is that a contract valid by the law of the place where it is made is valid everywhere, and will be enforced by the courts of every other country. But there are exceptions to this general rule, and among them contracts against good morals, and that tend to promote vice and crime, and contracts against the settled public policy of the state, will not be enforced, although they may be valid by the law of the place where they are made. Story, Confl. Laws, § 244; Westl. Int. Law, § 196; Whart. Confl. Laws, § 490.

The contention of the learned counsel for the defendant is that a court of this state ought not to enforce a contract made on the Lord's day in another state, though valid by the law of that state, because

the contract is the result of an immoral and irreligious act, and its enforcement here would shock the moral sense of the community and violate the public policy of the state. Assuming, but not deciding, that the determination of this question must be the same in this court that it would be in a court of the state, we will proceed to inquire whether there is any principle upon which a court of the state could refuse to enforce the contract in suit.

The common law made no distinction between the Lord's day and any other day. Contracts entered into on that day were as valid as those made on any other day. The contract in suit was voluntarily entered into, between parties capable of contracting, for a lawful and valuable consideration. It had relation to a subject-matter about which it was lawful to contract, and was a valid contract when and where it was made. No court ought to refuse its aid to enforce such a contract on doubtful and uncertain grounds. The burden is on the defendant to show that its enforcement would be in violation of the settled public policy of this state, or injurious to the morals of its people. Vague surmises and flippant assertions as to what is the public policy of the state, or what would be shocking to the moral sense of its people, are not to be indulged in. The law points out the sources of information to which courts must appeal to determine the public policy of a state. The term, as it is often popularly used and defined, makes it an unknown and variable quantity,—much too indefinite and uncertain to be made the foundation of a judgment. The only authentic and admissible evidence of the public policy of a state on any given subject are its constitution, laws, and judicial decisions. The public policy of a state, of which courts take notice, and to which they give effect, must be deduced from these sources.

In *Vidal* v. *Girard's Ex'rs*, 2 How. 127, 198, it was objected by Mr. Webster that the foundation of the Girard college, upon the principles prescribed by the testator, was "derogatory and hostile to the Christian religion, and so is void as being against the common law and public policy of Pennsylvania." In replying to this argument the court said:

"Nor are we at liberty to look at general considerations of the supposed public interests and policy of Pennsylvania upon this subject, beyond what its constitution and laws and judicial decisions make known to us.  *  *  *"

What is there, then, in the constitution, laws, and decisions of this state evincing a public policy hostile to the enforcement of contracts lawfully made in other states on the Lord's day? The constitution of the state declares:

"No human authority can, in any case or manner whatsoever, control or interfere with the right of conscience; and no preference shall ever be given by law to any religious establishment, denomination, or mode of worship above any other.  *  *  *  No religious test shall ever be required of any person as a qualification to vote or hold office; nor shall any person be rendered incompetent to be a witness on account of his religious belief."  Const. 1874, §§ 24, 26.

So much of the statute of the state as has any bearing on this question reads as follows:

"Sec. 1614. Every person who shall, on the Sabbath or Sunday, be found laboring, or shall compel his apprentice or servant to labor or perform other services than customary household duties of daily necessity, comfort, or charity, on conviction thereof shall be fined one dollar for each separate offense. * * *"

"Sec. 1617. Persons who are members of any religious society, who observe as Sabbath any other day of the week than the Christian Sabbath or Sunday, shall not be subject to the penalties of this act, so that they observe one day in seven, agreeably to the faith and practice of their church or society."

It is obvious the statute does not attempt to compel the observance of the first day of the week, as a day of rest, as a religious duty. It would be a nullity if it did so.

In *Bloom* v. *Richards*, 2 Ohio St. 387, the court—Thurman, J., delivering the opinion—said:

"Thus the statute upon which defendant relies, prohibiting common labor on the Sabbath, could not stand for a moment as a law of this state, if its sole foundation was the Christian duty of keeping that day holy, and its sole motive to enforce the observance of that duty."

And see, to the same effect, *Specht* v. *Com.* 8 Barr, 312; *City Council of Charleston* v. *Benjamin*, 2 Strob. 508.

In this country legislative authority is limited strictly to temporal affairs by written constitutions. Under these constitutions there can be no mingling of the affairs of church and state by legislative authority. All religions are tolerated and none is established. Each has an equal right to the protection of the law, whether Christians, Jews, or infidels. *Andrew* v. *Bible Society*, 4 Sandf. (N. Y.) 182; *Ayres* v. *Methodist Church*, 3 Sandf. (N. Y.) 377; Cooley, Const. Lim. 472. No citizen can be required by law to do, or refrain from doing, any act upon the sole ground that it is a religious duty. The old idea that religious faith and practice can be, and should be, propagated by physical force and penal statutes has no place in the American doctrine of government. Force can only affect external observances; whereas, religion consists in a temper of heart and conscious faith which force can neither implant nor efface. History records the mischievous consequences of all efforts to propagate religion, or alter man's relations to his Maker, by penal statutes. In religion no man is his neighbor's keeper, and no more is the state the keeper of the religious conscience of the people. The state protects all religions, but espouses none. Every man is individually answerable to his God for his faith and his works, and must therefore be left free to imbibe and practice any faith he chooses, so long as he does not interfere with the rights of his neighbor. The statute, then, is not a religious regulation, but is the result of a legitimate exercise of the police power, and is itself a police regulation. *Slaughter-house Cases*, 16 Wall. 36, 62, and cases cited; *Bloom* v. *Richards*, *supra; Specht* v. *Com.*, *supra; City of Charleston* v. *Benjamin*, *supra.*

Experience has shown the wisdom and necessity of having, at stated intervals, a day of rest from customary toil and labor for man and beast. It renews flagging energies, prevents premature decay, promotes the social virtues, tends to repress vice, aids and encourages religious teachings and practice, and affords an opportunity for innocent and healthful amusement and recreation. Neither man nor beast can stand the strain of constant and unremitting toil. Such a day, when designated by the state, is a civil and not a religious institution. No merely religious duty is enjoined. The statute does not require attendance on church, any more than it requires attendance to hear a lecture in support of infidelity. In point of lawfulness, there is no difference between an orthodox sermon and such a lecture on the Lord's day, in this state. The legislature might have required all persons to abstain from labor on the first or any other day of the week, without reference to their religious preferences or practices in that regard. But the statute of this state does not go to that length. While the law does not enforce religious duties and obligations as such, it has a tender regard for the conscience and convenience of every citizen in all matters relating to his religious faith and practice. The statute is catholic in its spirit, and accommodates itself to the varying religious faiths and practices of the people. In legal effect it declares every person must observe one day out of seven as a day of rest. But it does not attempt to bind all to the observance of the same day. Such a requirement would have the effect to compel many to observe two days of rest in each week,—the statutory day and the day which their religious faith constrained them to observe. The statute designates the first day of the week as the day of rest for all who do not by reason of their religious faith and practice observe some other day. Christians, who regard the first day of the week as a sacred day; infidels, who regard no day as holy; and Friends, who hold there is no more holiness in one day than another, but that all are to be kept holy,—are by the statute constrained to desist from labor on the first day of the week. On the other hand, Jews and Seventh-day Baptists may pursue their ordinary callings on that day, if they observe the seventh day of the week according to their faith; and Mohammedans may labor on the first, if they observe the sixth day of the week according to their faith. The statute grants to all persons, who, in the exercise of their religious faith and practice, observe one day in the week as a day of rest, the liberty of working on every other day of the week, without qualification or limitation. In this respect there is a pronounced difference between the law of this and some of the other states.

In many other states but slight regard is shown to those who observe any other than the first day of the week as a day of rest. The New York statute provides:

"Nor shall there be any servile working or laboring on that day, excepting works of necessity and charity, unless done by some person who uniformly

keeps the last day of the week, called Saturday, as holy time, and does not labor or work on that day, and whose labor shall not disturb other persons in their observance of the first day of the week as holy time."

The New Jersey statute provides that it shall be a sufficient defense for working on the Sabbath day, that the defendant keeps the seventh day as the Sabbath: "provided, always, that the work or labor for which such person is informed against is done and performed in his or her dwelling-house or workshop, or on his or her premises or plantation, and that such work or labor has not disturbed other persons in the observance of the first day of the week as the Sabbath." And it has been held that whatever draws the attention of others from the appropriate duties of the Lord's day disturbs them. And where one purchased a horse and gave his note for the same, in his own house, in the presence of his wife, the seller, and one other person, whose religious feelings were not at all shocked, and who made no complaint, it was held to be "to the disturbance of others." *Varney* v. *French*, 19 N. H. 233.

But the statute of this state draws no such invidious distinctions between those Christians who observe the first and those—be they Christians, Jews, or Mohammedans—who observe "any other day of the week, * * * agreeably to the faith and practice of their church or society."

It is not true, therefore, that all contracts made in this state on the Lord's day are void. A large number of the citizens of the state may lawfully labor and make contracts on that day. There can be no doubt of the validity of a note executed in this state on the Lord's day, when the parties to it refrain from labor on "any other day of the week, * * * agreeably to the faith and practice of their church or society." The validity of contracts made in this state on that day depends, therefore, on whether the parties to them conscientiously observe some other day of the week as a day of rest. If they do, their contracts made on the Lord's day are valid. Such contracts the courts of the state would be bound to enforce. If, then, it would be the duty of the courts of the state to enforce contracts made in the state between its own citizens on the Lord's day, having no relation to "household duties of daily necessity, comfort, or charity," how can it be said that the public policy of the state forbids the enforcement of such contracts made in another state, and valid by the law of that state? A court cannot declare that the public policy of the state evinces such a high regard for the sacredness of the Lord's day as to forbid it to enforce a contract lawfully made on that day in another state, when it is bound by law to enforce contracts made on that day in its own state. It may be justifiable in private life to "assume a virtue, though you have it not;" but courts, in the impartial administration of justice, are forbidden to assume a higher regard for the holiness of the Lord's day than is found in the constitution and laws of the state. To do so would deprive suitors of their

rights without law, and would, besides, be in the highest degree Pharisaical. And if the courts of the state would enforce contracts made on that day in the state between certain classes of her own citizens, how can the moral sense of the people of the state be said to be shocked by enforcing such contracts lawfully entered into elsewhere? No court is at liberty to impeach the constitution and laws under which it derives its jurisdiction and authority as a court, by assuming that what is lawful under them is shocking to the moral sense of the people who enacted them. But if no contracts made on that day in the state could be enforced, there would still be nothing in the objection that their enforcement would be too shocking to the moral sense of the community to be tolerated, for reasons forcibly stated by Judge REDFIELD, in delivering the opinion of the court in *Adams* v. *Gay*, 19 Vt. 358, 367:

"And before we could determine that any given cause shocked the moral feelings of the community, we must be able to find but one pervading feeling upon that subject; so much so, that a contrary feeling, in an individual, would denominate him either insane, or diseased in his moral perceptions. Now, nothing is more absurd, to my mind, than to argue the existence of any such universal moral sentiment in regard to the observance of Sunday. It is in no just sense a moral sentiment at all which impels us to the observance of Sunday, for religious purposes, more than any other day. It is but education and habit, in the main, certainly. Moral feeling might dictate the devotion of a portion of our time to religious rites and solemnities, but could never indicate any particular time above all others."

It is believed the moral sense of the community would esteem it a morally dishonest act for a debtor to refuse to pay a just debt because the evidence of it was executed on the Lord's day. Christians vary in their opinions of the manner in which the Lord's day ought to be kept. In continental Europe, sports, games, and practices are freely indulged in on that day, with the approval of the church, which the larger number of Protestant churches of England and this country do not approve.

The large emigration from Europe to this country is having a marked influence on public opinion, particularly in towns and cities, as to how the Lord's day ought to be kept. The Puritan view of the question has undergone some modifications through this influence. As a result of less restricted views on the subject, in this city, in the shadow of the capitol there are more than half a hundred places where spirituous liquors are sold on Sunday, the same as any other day in the week, without molestation fom the state or city authorities. It would be downright hypocrisy for a court to affect to believe that the moral sense of the community, which supports this condition of things, would be shocked by compelling a man to pay a note given for an honest debt because it was executed on the Lord's day. There may be a good many individuals who would feel so, but they do not constitute the community in the legal sense of that term.

It is an error to suppose that the supreme court of the state, in

*Tucker* v. *West, supra,* held Lord's day contracts void on religious or moral grounds. [See note.] That is not the ground upon which they are held void by any of the courts. The court held that the execution by the maker and the receipt by the payee of a promissory note was "labor," within the meaning of that word, as used in the statute.

It of course follows that the parties to a note executed on the Lord's day incur the penalty of the statute against those who labor on that day, viz., a fine of one dollar. By reference to the statute it will be observed that it does not in terms prohibit labor, or declare contracts void. It simply denounces a penalty against those "found laboring." Here two familiar and established rules of decision come into play. One of these is, that a penalty implies a prohibition of the thing itself, on the doing of which the penalty is to accrue, though there are no prohibitory words in the statute; and the other is, that a court of justice will give no assistance to the enforcement of contracts which the law of the land has interdicted.

"The ground upon which courts have refused to maintain actions on contracts made in contravention of statutes for the observance of the Lord's day, is the elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction." *Cranson* v. *Goss,* 107 Mass. 439; *Holman* v. *Johnson,* Cowp. 341; *Gibbs & Sterrett Manuf'g Co.* v. *Brucker,* 111 U. S. 597; S. C. 4 Sup. Ct. Rep. 572. There have been vigorous protests from time to time against the application of these principles to Lord's day contracts, upon the ground that they inflicted penalties, by judicial construction, out of all proportion to the offense, and not contemplated by the act, (*Bloom* v. *Richards, supra;* and see remarks of GRIER, J., in *Philadelphia, W. & B. R. Co.* v. *Philadelphia & Havre de Grace S. B. Co.* 23 How. 218;) but the great weight of authority is that a contract made in violation of the Lord's day acts is void, like any other illegal and prohibited contract, and upon no other or different ground. And the reason that a contract made in this state on the Lord's day between persons "who observe as Sabbath any other day of the week" is not void, is that the statute expressly declares they "shall not be subject to the penalties of this act," and as there is no prohibition in terms in the statute, it results that there is neither penalty nor prohibition against such persons making contracts or performing any other kind of labor on the Lord's day. But if by the statute all contracts made in this state on the Lord's day were void, it is believed that the result in the case at bar would not be different.

There is often great difficulty in practice in drawing the line between the foreign contracts which may and may not be enforced. The rules defining the comity of states in this regard are necessarily general in their terms, and the adjudged cases are not quite uniform. No case has been cited, and it is believed none can be found, holding that

a contract made on the Lord's day in a state where such contracts are valid, will not be enforced by the courts of another state, by the laws of which such contracts are void. But there is one case at least (there may be others which our limited examination failed to discover) that holds that in such case the contract will be enforced. The case is entitled to consideration, no less on account of the uniform high character of the decisions of the court than the acknowledged learning and ability of the judge who delivered the opinion. In *Adams* v. *Gay*, *supra*, the precise question arose. A contract which, if it had been made in Vermont, would have been void under the Lord's day act of that state, was made in New Hampshire on the Lord's day. In a suit arising upon that contract in Vermont, the question arose whether the courts of that state would give it effect. The court refused to take judicial notice of the law of New Hampshire, and did not indulge the presumption that it was the same as that of Vermont. The court, Judge REDFIELD delivering the opinion, said:

"The law of New Hampshire, then, being out of the case on account of its not having been proved at the trial, the contract between the parties is valid, unless it is void upon general principles of public policy, as being of evil example to our own citizens to see such a contract enforced in a court of justice."

And, after a full discussion of the subject, the court, on the assumption that the contract was valid in New Hampshire, held it valid in Vermont.

It has been decided that contracts for the purchase of lottery tickets, if valid where made, will be treated as valid and enforced in the courts of a state by the laws of which such contracts are illegal. *McIntyre* v. *Parks*, 3 Metc. 207; (in *Webster* v. *Munger*, 8 Gray, 587, THOMAS, J., expresses the opinion that *McIntyre* v. *Parks* was not rightly decided;) *Kentucky* v. *Bassford*, 6 Hill, 526. And the same doctrine has been maintained with reference to gambling contracts. Whart. Confl. Laws, §§ 487, 492.

This court is not to be understood as expressing any opinion as to the soundness of the doctrine of the cases last cited. They carry the doctrine of comity further than it is necessary to go to uphold the action in the case at bar. Lottery and gambling contracts are very generally regarded as inherently vicious and immoral, and wanting in a meritorious consideration, whenever and wherever made. Whereas, the contract in suit was not only obligatory where made, but was made for a valuable and meritorious consideration; and the only objection to its validity is that it was executed on an inappropriate day of the week,—a circumstance in which it would seem a state, other than that in which the contract was made, could have very little concern.

It has been held that when the law of the state where the contract was made, and the law of the state where the suit is brought, are the same, and a contract made on the Lord's day is void by the laws of both states, it will not be enforced; and that, in the absence of proof

to the contrary, the law will be presumed to be the same in both
states.   *Hill* v. *Wilker,* 41 Ga. 449 ;   *Sayre* v. *Wheeler,* 32 Iowa, 559.

---

NOTE.   Remarks may occasionally be found in opinions of courts, seem-
ingly laying some stress on the religious view of the question, and the fourth
commandment.   In illustration of this fact, the case of *Hill* v. *Wilker,* 41 Ga.
449, may be cited, where the court, to support the presumption that the law
of Kansas, like that of Georgia, forbid contracts on the Lord's day, say: "We
are sustained in this presumption by the fact that a contrary view would
suppose the people of Kansas to have annulled the decalogue, and to have
permitted by law the disregard of Christian obligation, and not only for-
gotten, but violated, the injunction : 'Remember the Sabbath day, to keep it
holy : on it thou shalt do no manner of work.' "   The court overlooks the
fact that the fourth commandment, a part only of which it quotes, relates
to the seventh day of the week ; and that if the laws of Kansas were in
harmony with that commandment, the contract which the court was con-
sidering, to have been invalid there, must have been executed on Saturday.

The curious and obvious error of the court in *Hill* v. *Wilker* illustrates
the danger of a civil court, which deals only with the temporal affairs of men,
predicating a judgment on its interpretation of the Bible commands relating
to spiritual affairs, and justifies a brief reference to the origin of the Lord's
day, and the legal distinction between that and the Sabbath.   It is a common
error to confound Saturday, the seventh day of the week, the Sabbath of the
Jews, and the day of rest named in the fourth commandment, with Sunday,
the first day of the week, properly called the Lord's day.   At an early period
in the history of the Christian church, the first day of the week was set apart
as a holy day, in memory of the resurrection of our Lord on that day.   It was
called the Lord's day, which is still its legal name, (3 Toml. Law Dict. tit.
"Sunday;") but Sunday, the heathen name for the day, and Sabbath, the name
of the Jewish day of rest, are now commonly used indifferently to designate
the day, and are so used in the statute of this state.

Writers on ecclesiastical law are not quite agreed as to what extent the ob-
ligations of the commandment and the Levitical law were abrogated by the
advent of our Savior; but conceding that the fourth commandment delivered
to the Jews is of universal obligation, the fact remains that that command-
ment has never been observed by the Christians so far as relates to the day of
the week.   The commandment declares explicity that "the seventh day is the
Sabbath of the Lord, thy God."   While many of the commandments are very
short, that relating to the observance of the Sabbath is worked out at consid-
erable length, and great stress is laid on the day of the week to be observed,
and the reason for observing that day.

The commandment to observe a day of rest is not any more explicit than
the direction as to what day it shall be.   Exodus, xx. 8, 11.   There is no ac-
count in the New Testament of the change from the seventh to the first day
of the week, nor even of the institution of the Lord's day.   Just when and
by whom it was instituted, and when it was first observed as the day of wor-
ship, and how it was otherwise observed, are questions involved in some ob-
scurity.   It was instituted sometime, and probably very shortly, after the res-
urrection of our Savior, and derives its character as a sacred day from that
fact, and the consent and practice of the early church and the apostles.   The
celebration of the Sabbath probably existed before the time of Moses.   How-
ever this may be, it has antiquity and an explicit command of the Old Testa-
ment to support its claims.   The Lord's day has the practice of the apostles
and Christian church since the resurrection of our Lord.   The week of seven
days is not found elsewhere, except among the Egyptians, and there no day

of rest was observed. At one period in their history the Jews observed the Sabbath with great strictness, not even defending themselves in time of war on that day, and punishing Sabbath-breaking capitally. Exodus, xxxi. 14; Numbers, xv. 32–36. The method of observing the day entered largely into their ceremonial code. They were much incensed at our Lord and His disciples for their desecration of the day, according to the Jewish law; and it was when challenged by the Pharisees for profaning the Sabbath that our Lord, after defending his disciples, boldly announced that "the Sabbath was made for man and not man for the Sabbath; therefore, the son of man is Lord also of the Sabbath." St. Mark, ii. 27, 28. By the Jews, who regarded the Sabbath as the everlasting covenant between God and Israel, (Exodus, xxxi. 15, 16,) the reply of our Lord to their accusation was looked upon as sacrilege. The liberal notions of our Lord with regard to the Sabbath deepened and widened the gulf between him and the Jews, and ultimately resulted in the complete repudiation of the Jewish Sabbath by the Christians, who substituted for it the day of the week on which our Lord rose from the dead.