GOODRUM v. MERCHANTS & PLANTERS BANK.

Opinion delivered January 8, 1912.

1. EVIDENCE—VARYING WRITING BY PAROL.—Where a written contract is plain, unambiguous and complete in its terms, parol evidence is not admissible to add to or vary it. Thus, where a bank cashier, apparently short in his accounts, conveyed land to a trustee to cover any shortage which might be found, it was inadmissible to prove that there was a contemporaneous understanding that such grantor was to be present when his accounts were to be examined. (Page 332.)

2. REFORMATION OF INSTRUMENT—MISTAKE.—To entitle a party to reform a written instrument upon the ground of mistake, it is essential to prove by clear and decisive testimony that the mistake was mutual and common to both parties. (Page 334.)

3. CONTRACTS—VALIDITY—COMPOUNDING OF FELONY.—Any contract, the consideration of which in whole or in part is to conceal a crime or to stifle a prosecution therefor is illegal and void, though it may represent a just debt and security for its payment. (Page 335.)

4. SAME—COMPOUNDING OF FELONY.—A deed of trust executed by a married woman to secure the payment of money embezzled by her husband is not void as given to compound a felony, in the absence of a promise on the part of the beneficiaries to forbear prosecution for the crime or to suppress evidence tending to prove it. (Page 340.)

5. HUSBAND AND WIFE—WIFE'S MORTGAGE FOR HUSBAND'S DEBTS.—A married woman may mortgage her separate property to secure the debt of her husband. (Page 340.)

6. MASTER—FAILURE TO TAKE OATH—WAIVER.—Where a party failed to object to the proceedings of a master at the time they were had upon the ground that the master was not sworn, he will be held to have waived the right to object. (Page 341.)

7. SAME—WHEN IRREGULARITY CURED.—Where a master took testimony and made his report without being sworn, but afterwards was sworn, and stated that all the proceedings had by him and findings made by him were correct, and it was agreed that the testimony taken on part of the defendant before the master should be read as if taken after the master was sworn, the proceedings and report were in effect made after he took the oath. (Page 342.)

8. EQUITY—WHEN RIGHT TO TRANSFER WAIVED.—One who goes to trial in a chancery court without asking for a jury or requesting a transfer to a law court will be held to have waived any right which he may have thereto.   (Page 342.)

9. SAME—JURISDICTION—ACCOUNTS.—Equity has jurisdiction where extended accounts, difficult of determination, are involved.   (Page 343.)

Appeal from Lonoke Chancery Court; *John E. Martineau,* Chancellor; affirmed.

### STATEMENT BY THE COURT.

This was an action instituted by the Merchants & Planters Bank, of England, Arkansas, against J. C. Goodrum, Jr., and his wife, Belle Goodrum, seeking to require from them the execution of a deed for certain lands which they had, for that purpose, conveyed to a trustee, who refused to carry out the trust by conveying said lands to plaintiff. The conveyance to the trustee was subsequently treated and held by the chancellor to be a mortgage to secure certain indebtedness alleged to be due by said Goodrum to plaintiff, and the cause proceeded and was determined as an action to foreclose same. It was alleged in the complaint that J. C. Goodrum, Jr., was the cashier of plaintiff's bank, and had converted to his own use a large amount of its funds. Thereupon he and his wife entered into a written contract with the bank whereby they agreed that expert accountants should be selected to examine the books of the bank in order to determine whether or not said Goodrum was criminally short in his accounts with the bank. In order to secure the payment of such criminal shortage, if any, they agreed to convey to a trustee for the use of the plaintiff certain lands, and, in event the accountants should find and determine that said Goodrum was criminally short in his accounts with the bank, the trustee should convey said lands to the plaintiff in satisfaction thereof. In pursuance of that agreement, the deed of trust was executed a few days thereafter by the defendants, and thereupon accountants were selected to examine the books of the bank. It was alleged that by said examination it was found that said Goodrum was criminally short in his accounts with the bank. Thereupon the plaintiff demanded the execution by said trustee to it of a conveyance of said lands, which he refused to make. The defendants filed answers in which

they set up a number of defenses to the recovery sought by plaintiff, chief amongst which were the following:

1. They alleged that it was agreed at the time said contract was entered into that said Goodrum was to be present at the examination of the books made by the accountants, which plaintiff refused afterwards to permit, and that the plaintiff thereby breached the agreement, rendering it ineffective.

2. That the contract was contrary to public policy and illegal, because it was made upon the consideration and promise to compound any felony committed by Goodrum in embezzling the bank's funds.

3. That the execution of the contract and deed of trust was obtained by duress; and, finally,

4. That Goodrum had not wrongfully taken any of the funds of the bank and was not criminally short in his accounts with it.

The chancellor appointed a master with directions to take testimony and to make findings "as to what amount, if any, the defendant as cashier of plaintiff's bank, was criminally short in his accounts at the time he was relieved of duty in December, 1909;" and also "to ascertain and report any other matter or things that may be of service to the court in determining the rights and equities of all the parties to this action." A great mass of testimony was taken by the master. He made report, setting out in detail his findings. He found that said Goodrum was criminally short in his accounts with the bank, and that the said shortage amounted to $19,121. The chancellor confirmed the report of the master; he declared the trust deed a mortgage securing said shortage, and thereupon entered judgment in favor of plaintiff for the amount thereof and a decree foreclosing said mortgage.

The testimony relative to the various issues involved in this case is conflicting. We do not deem it necessary to set this out in detail. The determination of the issue relative to Goodrum's alleged shortage depends to a large extent upon the examination of the accounts and entries in the books, the effect of which can only be fully appreciated by a thorough inspection and examination of the numerous entries and lengthy accounts in connection with the testimony of the witnesses relative thereto. This we have endeavored carefully to do, and

we have concluded that the matters can be better understood by giving in a general way the result which we think the evidence establishes.

The Merchants & Planters Bank was organized and opened for business in September, 1902, and the defendant was then employed to take charge of the books of the bank as assistant cashier. A short time thereafter he was elected cashier, and continued as such until December, 1909, when his relations with the bank were severed. From the organization of the bank until his connection therewith was terminated, he had complete charge of the books, moneys and assets of the bank, and every entry made in the general ledger during that time was made by him, and practically all entries made in the individual ledger and other books of the bank were made by him or by his authority and with his knowledge. Prior to his employment with plaintiff's bank, he had been clerk of Lonoke County for several years and had worked in minor positions in one or two other banks in the State. It appears that the officials of the bank and the people of the community in which it was located had great confidence in his ability and integrity. The bank was capitalized at $25,000, and its stock was principally owned by one R. E. L. Eagle, who was its cashier at its organization, and was afterwards its president. He was recognized as its principal owner, and the chief arbiter of its affairs during the time that Goodrum was connected therewith. While said Eagle had the ultimate supervision of the bank, its affairs and business were principally, and almost exclusively, managed and conducted by said Goodrum. In December, 1909, said Eagle was negotiating for a sale of his stock to parties who were nonresidents of the State, and requested the cashier, Goodrum, to give him a statement of the banks' assets and liabilities to present to the prospective purchasers. It appears that Goodrum had kept the books of the bank apparently balanced until 1906, but after that time the accounts on the general ledger were not kept balanced. This, we think, according to the testimony, was not known either by Eagle or any other director of the bank. The cashier, Goodrum, in his testimony claimed that the sole reason why the books were not duly kept balanced after 1906 was that his duties were so manifold that he did not have time to do so; that proper assistance was not furnished him to do

the work required.    Goodrum delayed making the statement requested from him, and, becoming impatient, Eagle endeavored to make a statement from the general ledger himself.    He testified that he then learned for the first time that the accounts of the assets and liabilities would not balance.    Becoming suspicious of the correctness of the books, he secured the services of one Frank Wittenberg, an expert accountant, to examine them.    On December 6, 1909, this accountant began the examination of the books and continued same for a few days, when he reported that there was a deficit of $13,848.12 in the funds as shown by the accounts of the cashier, and that, in addition to this, it appeared that there was a shortage in the account of bills receivable of $2,777.15.    Thereupon the president of the bank demanded that Goodrum should make good his shortage.

The charge that Goodrum was short in his accounts with the bank was published and made publicly known in the community where the bank was located.    Goodrum insisted that he had done no wrongful act; that the apparent shortage was only due to bad bookkeeping, or that, if it occurred in any other way, it was not due to any act of his own. At his solicitation, or at the request of his wife, one T. M. Fletcher, who was sheriff of Lonoke County and a warm friend of said Goodrum, came to the town of England, where the bank was located, and another friend of Goodrum, J. M. Gates, accompanied him.    As his friends and representatives, these persons endeavored to arrange and adjust these matters with the bank.    They met with the president and some of the directors of the bank, and, after consultation, formulated a written contract by which the alleged shortage should be adjusted.    This contract was thereafter signed by both Goodrum and his wife and the bank, and delivered to plaintiff, and, as to its material perts, is as follows:

"That whereas, the said J. C. Goodrum, Jr., has been in active charge of the assets and books of the said Merchants & Planters Bank of England, Arkansas, since its organization in 1902, up until the 11th day of December, 1909, and whereas an expert accountant, who has already gone over the books, has discovered inaccuracies and irregularities in said bank which show an apparent deficit of $13,848.24, and whereas the

said first party, J. C. Goodrum, Jr., denies any wrongful act on his part.

"It is therefore proposed and agreed upon between all the parties to this contract, and the said first parties hereby agree to deed in trust to W. P. Fletcher for the use and benefit of said bank their real property in Lonoke County, Arkansas, except the house in Lonoke, which is scratched out below, which includes the separate property of Mrs. Belle Goodrum, and also includes the home property situated in England, Arkansas, and also 80 acres of prairie land in said county, and in fact all real estate owned either by the said J. C. Goodrum, Jr., and the said Mrs. Belle Goodrum, whether owned jointly or separately, except the Lonoke house.

"This property is deeded in trust for and in consideration of making good to said bank any accounts that may hereafter be determined upon, that may be traced to the said J. C. Goodrum, Jr., on account of any criminal negligence, or acts which he has done, said amounts to be determined in the following manner: The said Goodrum, Jr., is to have the right to select a reputable accountant, and the said bank is to have the right to select one reputable accountant; these two accountants so selected shall immediately, as soon as practical, make a thorough investigation of the affairs of said bank from the time of its organization up until the............day of December, 1909, when the said J. C. Goodrum, Jr., was relieved as cashier; and if, after a thorough investigation, said investigation should show that the said J. C. Goodrum, Jr., is in any manner criminally short in his accounts, then this conveyance to the said W. P. Fletcher, as trustee, shall become final and binding upon the said first parties to this contract in the amount of such shortage, but, should accountants ascertain that the said J. C. Goodrum, Jr., has committed no criminal act, and is not short in his accounts criminally, then the conveyance to the said W. P. Fletcher, trustee, shall become null and void. It is further understood and agreed that said deed in trust to the said W. P. Fletcher, as trustee, shall be executed by said first parties immediately after ascertaining a correct description of said real estate."

A few days thereafter, in conformity with the provisions of said contract, Goodrum and his wife conveyed to said trustee said lands and duly acknowledged the execution of the con-

veyance, which was delivered and duly recorded. In pursu-
ance of said contract, the plaintiff selected said Wittenberg as
its accountant, and Goodrum selected one Kuhn as his account-
ant, and these two then proceeded to examine the books of the
bank. They first compared the statement made by said Wit-
tenberg in his report to the bank, and corrected some minor
errors found therein. They continued the examination for
probably seven or eight days, during all of which time said Good-
rum was present. About that time the accountant Wittenberg
made complaint to the representatives of the bank that Good-
rum was making alterations in some memorandum made by
said Wittenberg, and thereupon those representing the bank
demanded that Goodrum should not be present during the
time that the accountants were examining the books, but
should only be called when he was needed to explain any entry
therein. To this Goodrum and his accountant objected, and
refused to further proceed with the examination of the books
unless Goodrum was permitted to be constantly present. The
further examination of the books by the two accountants was
then abandoned. The trustee then refused, upon demand, to
make conveyance to the plaintiff of the property mentioned
in the deed of trust. Thereupon this suit was instituted.

*J. W. Blackwood* and *Thomas C. Trimble*, for appellants.

*F. T. Vaughan* and *James A. Gray*, for appellees.

FRAUENTHAL, J., (after stating the facts). 1. It is
contended by counsel for defendants that, at the time the
written contract was entered into for the adjustment of the
alleged shortage, it was agreed that Goodrum should be present
during the entire examination made by the accountants of the
books of the bank. It is claimed that this portion of the agree-
ment was omitted from the written contract by mistake, which
could be rectified by reformation, or that it did not add to or
vary the terms of the written contract. They urge, on the
contrary, that this portion of the agreement was either a part
of the consideration of the contract or a condition precedent
to its consummation, and that, in either event, it could be
proved by parol evidence. We do not think, however, that
this contention is correct. The written contract was signed
and delivered, and was, therefore, fully executed. It is plain,

unambiguous and complete in its terms. One of its objects was
to provide for an examination of the books of the bank and
therefrom to determine the state of the accounts. The written
contract sets out how this examination shall be made and by
whom. It does not provide that the examination shall be
made either by Goodrum or with his assistance. It is claimed
that one of the chief inducements for making the contract was
the agreement that Goodrum should be constantly present at
such examination; his presence would be unnecessary unless it
was also the purpose of such agreement that he would take part
in and assist at such examination. We are of the opinion that
this would be as distinct a term of the contract as if it had been
agreed that, in the event of any disagreement between the two
accountants, a third should be called in to make the examina-
tion of the books. This would add to the terms of the written
contract. It has been uniformly held that where a written
contract is plain, unambiguous and complete in its terms, parol
evidence is not admissible to add to or vary it. It has been said
by this court: "Antecedent propositions, correspondence
and prior writings, as well as oral statements and representa-
tions, are deemed to be merged into the written contract which
concerns the subject-matter of such antecedent negotiations
when it is free of ambiguity and complete." *Barry-Wehmiller
Machine Co.* v. *Thompson,* 83 Ark. 283. See, also, *Cox* v.
*Smith,* 99 Ark. 218, and cases there cited. It has also
been held by this court that where the written contract is
complete in its terms it can not be varied by adding thereto or
engrafting thereon any condition by parol evidence. *Lower* v.
*Hickman,* 80 Ark. 505; *Johnson* v. *Hughes,* 83 Ark. 105;
*Collins* v. *So. Brick Co.,* 92 Ark. 504. Nor would it be permissi-
ble, under the evidence adduced herein, to show by parol tes-
timony this alleged term of the contract upon the ground that
it was a condition precedent to the final completion thereof.
It is not claimed by any witness that the contract and deed of
trust, which were duly signed and delivered, were not fully
executed. There is no testimony indicating that this written
contract was not to be effective until this alleged condition
or term was complied with. If such term of the contract was
actually agreed to and was to be a part of the completed con-
tract, then at most it was inadvertently and by mistake omitted

from the written instrument; but under the testimony it was not understood or agreed that the written contract should be be deemed finally executed until such condition should be complied with. It follows that this portion of the agreement alleged to have been omitted from the written contract can not be deemed a condition precedent to the completion of the contract. *American Sales Book Co.* v. *Whittaker,* 100 Ark. 360.

Nor, under the evidence adduced, can parol testimony of this alleged omitted portion of the contract be considered for the purpose of reforming the written instrument or deeming it a part of a reformed contract. It is true that this is a suit instituted in a court of chancery, and is to be determined by principles enforceable in such court, and that equity will reform a written contract on the ground of mistake. But, to entitle a party to reform a written instrument upon the ground of mistake, it is essential that the mistake be mutual and common to both parties; in other words, it must be found from the testimony that the instrument as written does not express the contract of either of the parties thereto. It is also necessary to prove such mutual mistake by testimony which is clear and decisive before a court of equity will add to or change by reformation the solemn terms of a written instrument. *Varner* v. *Turner,* 83 Ark. 131; *McGuigan* v. *Gaines,* 71 Ark. 614; *Goerke* v. *Rodgers,* 75 Ark. 72; *Cherry* v. *Brizzolara,* 89 Ark.309. The testimony in the case at bar as to whether or not it was agreed, as a part of said contract, that Goodrum, the cashier, should be present at the examination to be made by the accountants is conflicting. We do not deem it necessary to set this testimony out in detail. Considering all of this testimony, we can not say that it appears beyond reasonable controversy that such agreement was made and entered into and understood to be a part of the contract, and that, by mistake, it was omitted therefrom. It follows, therefore, that the contract as written must be considered as containing all terms of the agreement which were then made, and we do not think that plaintiff violated any provision of the contract by objecting to the presence of Goodrum constantly during the examination of the books by the accountants. The contract was binding and enforceable, and could not thereafter be defeated by any act of Good-

rum or the accountant whom he had chosen attempting to avoid or annul its binding force.

2.   It is earnestly insisted by counsel for defendants that the contract entered into and the deed of trust executed are illegal and void because, as a part of the consideration thereof, either express or implied, it was agreed that Goodrum should be protected or shielded from criminal prosecution for any embezzlement by him of the bank's funds.   Especial insistence is made upon this defense, because the property conveyed by the deed of trust was principally that of the wife, and it is strongly urged that the chief, if not sole, motive inducing her to execute the contract and deed of trust was to secure immunity for her husband from criminal prosecution.   The determination of this question has given us much concern.   This question is one of fact.   The principles of law involved in the determination thereof, are, we think, well settled.   Any contract, the consideration of which, in whole or in part, is to conceal a crime or to stifle a prosecution therefor, is necessarily repugnant to public policy, and, for that reason, is illegal and void.   Such an agreement constitutes the compounding of a felony, which is made a crime by the statute of this State, which provides:

"Every person who shall have a knowledge of the actual commission of any offense punishable with death, or of any felony, who shall take any money or any gratuity or receive any promise, engagement or undertaking therefor, upon agreement or understanding, express or implied, to compound or conceal such crime, or to abstain from any prosecution therefor, or withhold any evidence thereof, shall upon conviction be fined in any sum not less than three hundred dollars, and be imprisoned not less than three months."   Kirby's Digest, § 1599.

Any contract, therefore, the consideration of which is to conceal or withhold evidence of a crime or to abstain from the prosecution therefor, is void, although it may represent a just debt and security for its payment.   *Rogers* v. *Blythe,* 51 Ark. 519; *Kirkland* v. *Benjamin,* 67 Ark. 480; *Beal & Doyle Dry Goods Co.* v. *Barton,* 80 Ark. 326; *Johnson* v. *Graham Bros.,* 98 Ark. 274.   But it is equally well settled that it is perfectly lawful for the parties to compromise and provide for the payment of the civil liability which arises from the commission

of an offense.   The commission of crime may result, and usually does, in a private as well as a public wrong, and an obligation given in settlement of the civil liability arising from such wrong is not invalid because the offender is also liable for criminal prosecution.   If the purpose of the agreement is to obtain security for the loss suffered, and not to suppress a criminal prosecution, then the contract therefor is perfectly valid.   The rule of law is thus stated in 2 Chitty on Contracts, p. 991: "In all cases of offenses which involve damages to an injured party for which he may maintain an action, it is competent for him, notwithstanding they are also of a public nature, to compromise or settle his private damage any way he may think fit, but an agreement for suppressing evidence or for stifling or compounding a criminal prosecution for a felony is void." See also *Breathwit* v. *Rogers*, 32 Ark. 758; *Martin* v. *Tucker*, 35 Ark. 279; *Rogers* v. *Blythe*, 51 Ark. 519.   Thus in the case of *Provident Association Society* v. *Edmunds*, 95 Tenn., p. 53, it was held that a note given in settlement of a deficit of an agent is not invalid because the agent was liable to criminal prosecution for his defalcation, in the absence of an agreement not to prosecute.   In the case of *School District* v. *Collins*, (Dak.) 41 N. W. 466, the defense was that the note was given to compound a felony, and the court said:   "In defenses of this kind, where it is sought to invalidate a written contract by parol evidence, it should be made to clearly appear that the arrangement was in contravention of public policy.   Vague and indefinite statements are not sufficient.   The understanding or agreement relied on must be positive and certain, entered into and relied on by both parties."   In the case of *Barrett* v. *Webber*, 125 N. Y. 18, it was held that a mortgage given by a married woman to secure the payment of goods stolen by her husband is not void as given to compound a felony, in the absence of a promise on the part of the mortgagees to forbear prosecution for the crime or to suppress evidence tending to prove it.   In the case of *Cass County Bank* v. *Bricker*, 34 Neb. 516, the court says:   "In order to establish the offense of compounding a felony, it must appear that there was an agreement not to prosecute the case or to suppress evidence tending to prove it.   The owner of the goods stolen has a right to receive compensation therefor."   And in the case of *Swan* v. *Swan*,

21 Fed. 299, Judge Caldwell says: "No court ought to refuse its aid to enforce a contract on doubtful and uncertain grounds. The burden is on the defendant to show that its enforcement would be in violation of the settled public policy of the State or injurious to the morals of its people, and vague surmises are not to be indulged in." In a note to the case of *Schrim* v. *Wieman*, 7 A. & E. Ann. Cas. 1008, the rule is thus formulated and appears to be sustained by the weight of authority: "An agreement by which the owner of stolen or embezzled property accepts securities representing the value of his property, or part thereof, and given by way of compensation for the debt or loss, or for securing the same, is not invalid as compounding a felony where the agreement does not include an offer of immunity from criminal prosecution to the perpetrator of the crime." In the case at bar, the contract entered into was put in writing, stating fully all of its terms. Two personal friends of Goodrum represented him at the conference with the bank officials when this contract was entered into and drafted. One of them was the sheriff of the county, who, before going to the conference, stated to Goodrum that if he had taken the money of the bank, he should give up his property in order to make restitution, to which Goodrum acceded. At that time no mention was made of any immunity to Goodrum from prosecution. The terms of the contract were discussed at the conference with the bank officials and there agreed upon, and the attorney of the bank and parties representing Goodrum then proceeded to the attorney's office to draft the contract. At the conference, no mention was made of any prosecution or of any promise of immunity from prosecution. The matter of prosecution was not then spoken of at all. After the contract was drafted, Mr. Gates then, for the first time, mentioned the matter of immunity from prosecution, and endeavored to obtain an agreement to that effect if the matters were fixed up, but, instead of acceding to that request, the president of the bank refused to make such an agreement. It was understood by all parties that the president of the bank owned the principal part of its stock, and that its actions would be controlled entirely by him in the matter. It was understood by all present that no other official of the bank could make any agreement or arrangement by which the bank would be bound.

Mr. Gates, one of the personal friends of Goodrum, and who represented him at this conference, was asked:

"Q. Was there in that meeting, in the presence of all the parties there present, any agreement with either Mr. Eagle or the directors of that bank that they would not prosecute Mr. Goodrum provided he would sign a contract or deed his property?

"A. Do you mean in the rear of his bank?

"Q. Yes.

"A. There was not. I didn't hear it.

"Q. Was there anything mentioned in regard to it?

"A. There was not that I heard there."

He testified further that after the contract had been drafted in Mr. Gray's office, he then asked Mr. Eagle, or the bank directors, if they would agree not to prosecute Mr. Goodrum if he and his wife would sign the agreement, and that Mr. Eagle replied that he could not make such an agreement, and that if he was summoned before the grand jury he would tell the whole truth relative to the matter. He was further asked whether Mr. Eagle agreed at any time not to prosecute Mr. Goodrum, or to refrain or abstain from telling the whole truth in reference to the transaction if he was summoned before the grand jury, and he answered that he did not. He also stated that it was his understanding, and, as we think, his opinion, that it would not be the disposition of the bank to prosecute, but we can not say from his testimony that there was any agreement to that effect on the part of the bank. Mr. Fletcher, the other friend of Mr. Goodrum, testified relative to the entire matters of the agreement constituting the contract as follows: "The essence of that contract is this and nothing else: for consideration of Goodrum being allowed to take those books, with an accountant and their accountant, and all of their board of directors, if they so desire, show to the board of directors that he had not stolen $13,800, but, if he was not able to show that, confiscate his property by deed of trust to W. P. Fletcher, to be turned over to the bank to cover whatever shortage there may be. That is the essence of the contract." He further testified: "I was there as a citizen and officer, in a way as a citizen more, to try and bring about between these two neighbors, if possible, an understanding

over a business misunderstanding, or to bring together, if this man was criminal, the payment to this bank of what was due them.   If he was not, let him have an opportunity to show them that he was not.   Now, that is all there is to it."   It is true that Mr. Swaim, one of the directors, also testified that he said that he was willing that there should be no prosecution, but, as before stated, it was understood by all parties that Mr. Eagle, and not Mr. Swaim, would represent the bank in its actions.   Mr. Eagle testified that when he was asked  if the bank would agree not to prosecute Goodrum he said:  "Not on your tintype.   I would'nt sign an agreement like that if I never got a dollar of the money back.   I said: 'If you will turn this property back if there is a shortage, we won't lie around the courthouse and try to prosecute him; but if the grand jury calls on me and asks me to explain these books and asks me if the shortage occurred upon the expert's report, I will tell them every thing I know about it.' "   We do not think that this statement of Mr. Eagle in effect that he would not go before the grand jury until summoned to appear was an implied agreement either to withhold testimony, conceal the crime or to stifle a prosecution under the facts and circumstances of this case.   The charges made against Goodrum that he was short in his accounts with the bank, and criminally so, were not only known to all the directors and persons present at the conference, but they had been published to the world, and the knowledge thereof was rife amongst the people of that community, if not also amongst the people of the county.   This is not a case where the charges were only known by a few persons, and upon their failure to divulge them they would not come to the notice or knowledge of the public or to those to whom the prosecution of crime is entrusted by the law.   The charges were already within the knowledge of the public, and there could be no concealment thereof if any member of the public started a prosecution therefor.   At the most, Eagle only stated that he would not instigate a prosecution.   He also said that he not only refused to agree not to prosecute but, if asked by any public official, he would tell everything relative to the matter; instead of going of his own motion before the grand jury, he would await a summons that might come to him from the public authorities who, the testimony shows, had full  knowledge of

these charges. Under these circumstances, we do not think that there was any agreement, either express or implied, to conceal a crime or to withhold any evidence thereof. Because he would remain passive relative to matters of which the public authorities had full knowledge, it can not be said that he thereby agreed to shield Goodrum from any public prosecution. *Davis v. State*, 95 Ark. 555. The chancellor found that the plaintiff did not agree, either expressly or by implication, to shield Goodrum from proseccution or to withhold any evidence which it had showing the commission of crime by him. We have examined all the testimony, and we can not say that his finding in this regard is clearly against the preponderance of the evidence. Under such circumstances, his finding should not be disturbed. It is true that Mr. Gates told Mrs. Goodrum that there would be no prosecution of her husband if the matter was arranged; but there is no testimony in the case that he had any authority to make any such representation to her from the plaintiff or any one connected with it, and the plaintiff, as mortgagee, can not, therefore, be bound by any representation that he made under these circumstances without its knowledge or direction. *Moyer. v. Dodson*, 212 Pa. St. 344.

It is also claimed in this connection that Mrs. Goodrum executed the contract and deed of trust through duress by reason of a dread of prosecution of her husband; but we do not find from the testimony that any threat of prosecution of her husband was ever made to her by any one representing the plaintiff, or that any representative of the plaintiff induced her to execute the contract and deed of trust by any threat of such prosecution. It can not be said, therefore, that these instruments were executed by her through duress. *Compton v. Bunker Hill Bank*, 96 Ill. 301.

It is further urged that certain of the lands conveyed by the deed of trust were the separate property of the wife, and therefore should not be sold for an executory contract to pay the debt of the husband. But a married woman, under the laws of this State, may convey by mortgage her property in order to secure the debt of her husband, and the mortgage thus executed, it has been uniformly held, will be enforced. *Collins v. Wassell*, 34 Ark. 17; *Scott v. Ward*, 35 Ark. 480; *Petty v. Grisard*, 45 Ark. 117; *Goldsmith v. Lewine*, 70 Ark. 516.

3.  It is urged that the testimony does not show that Goodrum was criminally short in his accounts with the bank, and that on this account recovery should not be had.    We understand from the contract that if Goodrum himself had wrongfully taken any of the funds of the bank and converted same to his own use, then he would be criminally short in his accounts, within the meaning of this contract, and we think the contract was so understood by Goodrum and all the parties.    He would not be liable for the payment of any moneys arising from errors in keeping the accounts or for any funds taken by any other person, but he would be liable under this contract for such moneys as he wrongfully took himself and converted.    Under the law, he was civilly liable to the bank for such conversion, and an agreement to pay such liability was perfectly valid.    We do not deem it necessary to enter into any discussion of the testimony relative to this shortage.    It was fully investigated by the master and by the chancellor, and we have also endeavored carefully to examine it.    The testimony is voluminous, and consists, amongst other things, of an examination and inspection of the books, papers and accounts of the bank, of alleged false entries and of altered figures.    The master, in his report, states in detail the matters relating to these accounts and the evidence showing that Goodrum had wilfully made false entries therein and changed the figures thereof in many instances in order to cover moneys which he had wrongfully taken. The chancellor also examined Goodrum in open court in order to more fully understand these matters and to see if any explanation could be made thereof consistent with his claim, and it appears to us that the chancellor proceeded with a great deal of care.    After this investigation, he confirmed the report of the master.    The findings made by the master and the chancellor are not only persuasive upon us, but, after as careful an examination as we are able to make of this testimony, we are of the opinion that they are not contrary to the weight of the evidence.    These findings must therefore stand.

4.    Objection is made to the report of the master upon the ground that he was not sworn before beginning the performance of his duties.    By section 6327 of Kirby's Digest it is provided that, before entering upon his duties, the master shall be sworn in open court to faithfully and impartially perform said duties,

and it is provided further that an entry of such oath should be made upon the record. It appears that, through inadvertence, the master did not take the oath thus required before beginning his duties; but the defendant and his counsel appeared before the master and during the extended time in which the testimony was taken by him no objection was made to his proceeding on this account. It is provided by the statute that the oath should be taken in open court, and it will be presumed that all parties were present in court when any step was taken in the progress of this case. The defendant is, therefore, presumed to have known whether or not the master was sworn and could have definitely learned this by an inspection of the record where, by statute, it is provided such oath should be noted. By failing to raise any objection to the proceedings of the master at the time they were had, we think that the defendant waived any right to object because the master was not sworn. 17 Enc. Pl. & Pr. 1016; 24 Cyc. 817; *Newcomb* v. *Wood*, 97 U. S. 581; *Nason* v. *Luddington*, 8 Daly (N. Y.) 149; *Garritty* v. *Hamburger*, 136 Ill. 499. After the master had made and filed his report, counsel for defendant, for the first time, raised objection thereto on the ground that he was not sworn. Thereupon, by direction of the chancellor, the master was duly sworn, and he then stated that all the proceedings had by him and all the findings made by him in his report were correct. By stipulation, duly signed by counsel for defendant, it was further agreed that all testimony taken on the part of defendant before the master should be read in evidence with the same and like effect as if taken before the master after he had taken the oath as required by law. Thereupon the chancellor considered the testimony returned and the report made by the master, and passed thereon. We are of the opinion that, even if it should be considered that the failure of the master to take the oath required by law was not a mere irregularity, his proceedings and report were in effect made after such oath had been duly taken by him, and that the law in this particular was in effect duly complied with.

5. Finally, it is urged that the court erred in not transferring this cause to the law court and thus granting to the defendant the right to have the issues involved in this case tried by jury. It appears that, after the master had made and filed

his final report, and after the trial of the case had begun and progressed to the point where the chancellor had partially, if not finally, passed upon the master's report, counsel for the defendant requested that the cause be transferred to the law court, in order that the issues might be tried by a jury. At this time all the testimony in the case had been taken, both parties had announced ready for trial before the chancellor, and the trial was proceeded with. Up to that time, the defendant had not made any request for a trial of the issues by a jury. If he was entitled to a trial by jury of the issues involved herein, we think that, in failing to ask for a jury or to request that the cause be transferred to a law court before the trial was actually begun, he waived any right to ask for a jury to try the issues. *Love* v. *Bryson*, 57 Ark. 590; *Gerstle* v. *Vandergriff*, 72 Ark. 261. But the matters involved in this suit were within the jurisdiction of a court of equity. Whether or not an issue involved in a cause over the subject-matter of which a court of chancery has jurisdiction shall be submitted to a jury is within the sound discretion of the chancellor, and when so submitted its finding would only be persuasive and not conclusive. *Hinkle* v. *Hinkle*, 55 Ark. 583. The defendant did not have an absolute right to a trial by a jury of an issue involved in a subject-matter over which the chancery court had jurisdiction, and this is especially true where extended accounts, difficult of determination, are involved. *State* v. *Churchill*, 48 Ark. 226; *Williams* v. *Citizens*, 40 Ark. 290. Upon an examination of the entire record, we can not say that the chancellor committed any error calling for a reversal of the decree which he entered in this case. His decree must accordingly be affirmed, and it is so ordered.

WOOD and HART, JJ., dissent.

HART, J., (dissenting). R. E. L. Eagle, the president of the bank on the 20th day of January, 1910, swore out a warrant before a justice of the peace charging J. C. Goodrum, Jr. with larceny and embezzlement. Eagle, according to the abstract of appellant, which is not challenged by appellee, testified in regard to this as follows: "He (referring to Goodrum) refused to comply with his contract, not as I understand it but refused to comply with the contract as the contract is itself. If Goodrum had carried out his contract, I would not have sworn out

that affidavit unless somebody made me do it." The plain meaning of this, even when read in connection with the testimony of Eagle as it appears in the opinion of the majority, is that there was at least an agreement between the parties that none of the bank officials would institute a prosecution against Goodrum. In short, the bank officials' agreed that if the instruments in question were executed none of them would voluntarily prosecute Goodrum, and the papers were executed and received accordingly. Under this state of facts, we need go no further than our own decisions to ascertain the law of the case. In discussing the law applicable to a similar state of facts, Mr. Justice Hemingway, speaking for the court in the case of *Shattuck* v. *Watson*, 53 Ark. 147, said: "It is a principle that guides equity courts in their administration of justice that he who invokes their aid must come with clean hands—that he who hath committed iniquity shall not have equity. It is the policy of the law that crime shall be prosecuted, and it prohibits under severe penalties the suppression of the prosecution. An injured party who agrees with the felon who robs him that he will not prosecute him, on condition that he return the stolen goods, or who takes a reward on such condition, violates the spirit as well as the letter of the law. The party who gives the reward and the party who receives it, on such condition, stand *in pari delicto*." There the party who executed the mortgage invoked the aid of equity to cancel it, and the relief was denied; but the principle is the same. The law will give no aid to either of them, but leave them where they have placed themselves. Therefore I think the chancellor erred, and should have dismissed the complaint against Mrs. Goodrum for want of equity.

Wood, J., concurs.