HARTFORD FIRE INS. CO. et al. v. CHICAGO, M. & ST. P. RY. CO.

(Circuit Court, N. D. Iowa, Cedar Rapids Division. September 11, 1894.)

1. LEASES—EXEMPTIONS OF LESSOR FOR NEGLIGENCE — STATE DECISION—RULE OF PROPERTY.

The provision in a lease that the lessor shall not be liable for destruction, through his negligence, of the building on the leased land, does not affect title to real estate; and therefore the question as to its validity is not within the rule that decisions of state courts constituting a rule of property will be followed by the federal courts.

2. RAILROAD COMPANIES — LEASES — QUESTIONS AFFECTING INTERSTATE COMMERCE.

The facts that a lease exempting the lessor from liability for destruction of the buildings on the leased land is of part of a railroad company's depot grounds, and that it is to be used for a cold-storage warehouse, do not render the question of the validity of the exemption one affecting interstate commerce,—a matter of federal control.

3. SAME—LIABILITY FOR FIRES—STATE CONTROL.

Defining the extent of the liability of railroad companies for destruction of property by fires in the operation of the road is within the control of the state; therefore a federal court will hold valid the exemption in a lease of the lessor, a railroad, for the burning of the buildings on the leased property, through the negligence of the road, it not being against the public policy of the state.

4. PUBLIC POLICY—CHANGE—EFFECT ON CONTRACTS.

If at the time a court determines the validity of an exemption in a lease of the lessor from liability for destruction, through his negligence, of buildings on the leased land, such exemption is not against the public policy of the state, it is of no consequence what the public policy was at the time the lease was executed, as a change would not impair the obligation of contracts, but merely affect the remedy.

Action by the Hartford Fire Insurance Company and others against the Chicago, Milwaukee & St. Paul Railway Company. Plaintiffs demur to the answer. Demurrer overruled.

Herrick & Hicks, C. A. Clark, and R. W. Barger, for plaintiffs.
Mills & Keeler, for defendant.

SHIRAS, District Judge. The questions presented by the demurrer to the answer in this cause grow out of the following state of facts, as disclosed by the pleadings in the case: On the 1st day of February, 1890, the defendant railway company executed a lease, in writing, to the firm of Simpson, McIntire & Co., of a named portion of its depot grounds at Monticello, Jones county, Iowa, for the term of one year, with the right to erect and maintain on the leased premises a cold-storage warehouse, "and upon the express condition that the said railway company, its successors and assigns, shall be exempt and released, and said parties of the second part, for themselves and for their heirs, executors, administrators, and assigns, do hereby expressly release them, from all liability or damage by reason of any injury to or destruction of any building or buildings now on or which may hereafter be placed on said premises, or of the fixtures, appurtenances, or other personal property remaining inside or outside of said buildings, by fire occasioned or originated by sparks or burning coals from the locomotives, or from

any damage done by trains or cars running off the track, or from the carelessness or negligence of employés or agents of said railway company." Simpson, McIntire & Co., as authorized in this lease, erected a cold-storage warehouse on the leased premises, and continued in the occupation thereof until November 11, 1892, when the building and contents were destroyed by fire, which fire, it is averred in the petition, was due to the negligence of the company in moving and operating its trains. At the time of the fire, Simpson, McIntire & Co. held insurance policies in the plaintiff companies upon the warehouse and its contents, consisting of butter and eggs, upon which policies the companies paid to Simpson, McIntire & Co. the aggregate sum of $27,118.88, which amount they now seek to recover, against the defendant railway company, as assignees of the rights of Simpson, McIntire & Co. As a defense to this claim, the railway company pleads the stipulation in the lease already cited, and the plaintiffs demur thereto, on the ground that the exemptions from liability sought to be secured by the conditions contained in the lease are void, because contrary to public policy. This demurrer was argued orally before me at the April term of this court, and it then appeared that a case involving the question at issue was pending before the supreme court of Iowa; that, upon the first hearing before that court, it had been held that such stipulations or conditions were void as against public policy, but, upon a rehearing and reargument, the court had held to the contrary, and had sustained the validity of the condition, stipulating for exemption from liability; and that a second petition for rehearing had been filed, and was then pending before that court. Under these circumstances, final action on the demurrer was postponed, awaiting the decision of the supreme court of Iowa. Since then the supreme court of Iowa has refused the petition for rehearing, thereby finally affirming the validity of an exemption from liability for fires negligently caused, such as is contained in the lease to Simpson, McIntire & Co. Griswold v. Railroad Co. (Iowa) 57 N. W. 843.

Counsel for the parties have now finally submitted the demurrer upon very full and able briefs. Upon behalf of the plaintiffs, it is strenuously argued that this court is not bound by the ruling of the state supreme court upon the question involved, but, on the contrary, that it is the duty of the court to exercise its independent judgment upon the question whether the condition contained in the lease is or is not valid. Counsel for plaintiffs have presented in their brief citations from a large number of cases decided by the supreme court of the United States, which iterate and reiterate the rule that the courts of the United States are not bound by the decisions of state courts upon questions of general law, or upon questions arising out of matters committed by the constitution to national control, or even upon the construction of state constitutions or statutes, when the question at issue is the effect of such constitutions and statutes upon pre-existing contracts. But it does not seem to me that these cases reach the real point at issue upon this demurrer. If the demurrer presented the legal question

whether a contract which was in substance contrary to public policy was enforceable in the courts of the country, and it should appear that the supreme court of Iowa had held, as a proposition of law, that the fact that the contract was contrary to public policy was not a bar to its enforcement through the aid of judicial process, this court would clearly not be bound by the decision of the state court. The effect upon the validity or enforceability of a contract, of the fact that its provisions are admittedly contrary to public policy, would be a question of general law, upon which this court must exercise its own judgment. In fact, however, this court and the supreme court of Iowa are in accord upon this question of general law, and in both forums it is held that a contract contrary to public policy is invalid.

The real question for consideration is, how shall it be determined whether the contract is or is not contrary to public policy? The subject-matter of the contract may be such that it affects the country at large, or it may be local in its nature. The nature of the subject-matter determines the source from which light must be sought upon the question of fact whether the provisions of a given contract are or are not contrary to public policy. In other words, there is a public policy of the nation, applicable to all matters wherein the people at large are interested, including those committed to the control of the national government, and coextensive with the boundaries of the union, and also a state public policy adapted to the circumstances of the locality embraced within the boundaries of the state, and applicable to all matters within state control. Thus, in Greenhood on Public Policy, it is said that any contract made by a competent party, upon valuable consideration, is valid, unless it binds the maker to do something opposed to the public policy of the state or nation. Greenh. Pub. Pol. p. 1, rules 1 and 2. In seeking to ascertain the requirements of the public policy of the nation, the principal sources of information are the constitution of the United States, the statutes enacted by congress, and the decisions of the courts, federal and state; and in case there should be a divergence in the views of the federal and state courts upon a question of national public policy, the conclusion reached in the federal courts must be accepted as the best evidence of what the requirements of the national public policy are. On the other hand, when seeking to determine the public policy of the state towards a subject within state control, the principal sources of information are the state constitution and statutes and the decisions of the courts, state and federal; and, in case of a divergence between them, the decisions of the state court must be accepted as the best evidence of the public policy of the state. Vidal v. Girard's Ex'rs, 2 How. 127–197; Swan v. Swan, 21 Fed. 299.

Thus, we are brought to the question whether the contract found in the lease to Simpson, McIntire & Co. deals with a subject-matter which falls within national or state control. On behalf of the defendant, it is argued that the lease and the stipulations therein contained create or convey a title to real estate, and thus form part of a subject-matter clearly within state control. I am not prepared

to go to this extent in construing the subject-matter of the contract between the parties. The lease, as a whole, creates and conveys a title to real estate; and, if the question at issue was one touching the title conveyed, it would come within the rule that the decisions of the state courts, which constitute a rule of property, will be accepted and followed by the federal courts. The lease, however, in addition to its clauses creating and conveying a leasehold interest to Simpson, McIntire & Co., contains other provisions constituting a contract, not affecting the title to the realty, but dealing with the question of the liability for fire accidentally or negligently set out or caused in the operation of the railway of the defendant,—a question apart from that of title to realty, wherein the decisions of the state court become a rule of property.

On behalf of plaintiffs it is argued that the conditions in the lease affect the question of interstate commerce,—a matter of national control,—because cold-storage warehouses, adjacent to railways and the depots thereof, are needed to protect produce, like butter, when being gathered for shipment out of the state. To a certain degree, interstate commerce is dependent upon the erection and maintenance of proper warehouses for the reception and storage of the products of the country, but the fact that such buildings are so used does not place them beyond the police power of the state. Thus, it is clearly within the power of the state to direct the character of the buildings that may be built for storage purposes. As a protection against fire, the state may enact that elevators, depots, warehouses, and the like shall be built of brick or iron, and not of wood; and the power of the state in this respect cannot be denied on the ground that such buildings are needed for and used in commerce between the states. Neither is there force in the suggestion that the conditions contained in the lease pertain to the duties and obligations resting upon common carriers engaged in interstate commerce. There is nothing in the pleadings which shows that the property burned was used in connection with interstate commerce; but, even if that was the fact, the conditions of the lease do not deal with the relations of common carriers and the public, nor did these relations exist between the defendant and Simpson, McIntire & Co. with regard to the property destroyed by the fire which consumed the warehouse and its contents. The stipulations in the lease, so far as they affect this case, deal only with the duty and obligation resting upon the defendant company growing out of the fact that the company, in its business, uses the dangerous agency of fire. The right to use the agencies of fire and steam in the movement of railway trains in Iowa is derived from the legislation of the state, and it certainly cannot be denied that it is for the state to determine what safeguards must be used to prevent the escape of fire, and to define the extent of the liability for fires resulting from the operation of trains by means of steam locomotives. This is a matter within state control. The legislation of the state determines the width of the right of way used by the companies. The state may require the companies to keep the right of way free from combustible material. It may require the depot and other buildings

used by the company to be of stone, brick, or other like material when built in cities or in close proximity to other buildings. The state, by legislation, may establish the extent of the liability of railway companies for damages resulting from fires caused in the operation of the roads. When providing for the acquisition or condemnation of the right of way, the state may declare the public uses to which the right of way may be subjected. Can there be any doubt that the state may empower the railway companies to contract with third parties for the erection of warehouses or elevators on the right of way, to be used for the reception and storage of grain and other products, preparatory to shipment upon the railway, and that the state can define the extent of the liability of the railway companies for damages resulting to such property from fires caused by the operation of trains upon the railway? These considerations, and others of like import which might be suggested, clearly show that it is a matter within state control to determine the extent of the liability for injury by fire resulting from the operation of railway trains under charters or authority granted by the state. Therefore, when the question arises whether a given contract, intended to define or limit the liability of a railway company with respect to injury resulting from fires, is valid or not, it must be solved by ascertaining what is the statute law or public policy of the state wherein the fire may have occurred. In the case now before the court, if the contract contained in the lease does not violate any of the provisions of the constitution of the state of Iowa, or is not contrary to any statute of the state, or is not contrary to the public policy of the state as otherwise declared, it cannot be held invalid.

It is not claimed that the contract contained in the lease violated any provisions of the state constitution or statutes, but it is averred that it is repugnant to public policy. As already shown, evidence of the public policy of a state is ordinarily to be sought in the constitution, statutes, and judicial decisions of the state. The right of parties to contract freely and fairly cannot be denied upon the ground of an adverse public policy, unless it clearly appears that there is a recognized or established public policy touching the subject-matter which will be violated if the contract is enforced. The burden is upon the plaintiffs in the case of showing that the contract in question is contrary to the public policy of the state of Iowa. No express provisions of the constitution or statutes of the state are cited as evidence of the public policy of the state, and the only final decision of the supreme court of the state upon the question holds that a contract such as is found in the lease to Simpson, McIntire & Co. is not contrary to the public policy of the state. Upon what theory can this court hold that the invalidity of the contract is established? Is this court justified in ignoring the decision of the supreme court of Iowa as evidence of the public policy of the state? Clearly not. But it is argued on behalf of plaintiffs that the final decision of the supreme court of Iowa in the Griswold Case should not be considered, because it was not rendered until after this contract was entered into, and in fact not until after this suit was commenced. The supreme court of the United States,

in applying that provision of the federal constitution which declares that no state shall pass a law impairing the obligations of contracts, has uniformly held that the validity of a contract was to be determined by the laws in force at the date of the contract, whether evidenced by express statutes or by the decisions of the courts; and that if, thus tested, the contract was valid at its inception, it could not be rendered invalid by a subsequent change in the law of the state, whether that change was brought about by legislative enactment or by a difference in the decisions of the courts.    This provision of the constitution is intended to prevent the impairment of the obligation of contracts, valid when made, by a subsequent change in the law of the state, and the principle has no application to the case at bar.    When the lease to Simpson, McIntire & Co. was executed, in February, 1890, it had not been ruled or held in Iowa that conditions such as are contained therein were contrary to public policy.    It cannot be maintained that Simpson, McIntire & Co. were induced to execute the lease in reliance upon any decisions of the courts of Iowa that such conditions were invalid and void, and hence there has not been such a change in the state law, evidenced by the decisions of its courts, as would bring the case within the provision of the constitution of the United States.    In fact, the decision in the Griswold Case, supra, instead of impairing the obligation of the contract entered into by Simpson, McIntire & Co., sustains the validity thereof.    Furthermore, even if it were true that at the time the lease in question was executed the conditions therein contained limiting the liability of the railway company for damages caused by fire were then, in fact, contrary to the public policy of the state, but the requirements of such public policy have since been changed by statutory enactment or by the decisions of the supreme court of the state, so that when the fire occurred, in November, 1892, such exemption from liability was not contrary to public policy, would not such change in the law of the state have the effect of rendering the condition in the contract enforceable by judicial aid?    The final decision in the Griswold Case shows that on the 30th day of April, 1890 (more than two years before the fire happened in this case), the public policy of the state was not adverse to the validity of exemptions from liability, such as are contracted for in the lease to Simpson, McIntire & Co.    In Ewell v. Daggs, 108 U. S. 143, 2 Sup. Ct. 408, this general question came before the supreme court in a suit for the foreclosure of a mortgage brought in the state of Texas.    The defense was a plea of usury.    It appeared that, when the mortgage debt was contracted, a statute of the state of Texas declared all contracts for the payment of interest at a rate greater than 12 per cent. per annum to be void, but that the principal sum loaned, without interest, would be recovered.    The note secured by the mortgage included interest at the rate of 20 per cent. per annum, and therefore, under the statute in force at the date of the note, the contract for interest was invalid.    Subsequently, the state of Texas adopted a new constitution, which, in terms, repealed all usury laws without any saving clause as to existing contracts.    The supreme court held that the defense of usury

could not be maintained, the general principle being stated as follows:

"Independent of the nature of the forfeiture as a penalty, which is taken away by a repeal of the act, the more general and deeper principles on which they are to be supported is that the right of a defendant to avoid his contract is given to him by statute, for purposes of its own, and not because it affects the merits of his obligation; and that whatever the statute gives, under such circumstances, as long as it remained in fieri, and not realized by having passed into a completed transaction, may by a subsequent statute be taken away. It is a privilege that belongs to the remedy, and forms no element in the rights that inhere in the contract. The benefit which he has received as the consideration of the contract which, contrary to law, he actually made, is just ground for imposing upon him, by subsequent legislation, the liability which he intended to incur. That principle has been repeatedly announced and acted upon by this court. * * * The right which the curative or repealing act takes away in such a case is the right in the party to avoid his contract,—a naked legal right, which it is usually unjust to insist upon, and which no constitutional provision was ever designed to protect."

The rule applicable to cases of the character of that now before the court, wherein a party seeks to evade the obligation of a contract to which he is a party, on the ground of public policy, is that the court will not lend its aid to enforce the contract if, at the time its aid is sought, the contract is contrary to the then existing public policy. The court, in such case, refuses its aid for the enforcement of the contract, not because such is the right of either of the contracting parties, but because the public interests are adverse to the enforcement of the contract. If, however, at the time when the aid of the court is sought to enforce the terms of an existing contract, the public interests do not demand that the court should refuse to aid in enforcing the contract according to its terms, the court would not be justified in refusing its aid simply because at some previous time, under the then existing laws, and as circumstances then were, such aid would have been refused if then demanded. Thus, in the present case, the defendant asks the court to enforce in its favor the conditions of the contract existing between it and Simpson, McIntire & Co. The plaintiffs, as assignees of the rights of Simpson, McIntire & Co., object to the enforcement of the terms of the contract, on the ground that the same are contrary to the public policy of the state. To sustain this objection to the enforcement of the contract, it must appear that the contract is adverse to the now existing public policy of the state; for, unless that be true, the court is not justified in refusing its aid for the enforcement of a contract which is confessedly good between the parties thereto. Therefore, the inquiry is, what is the public policy of the state of Iowa upon the question of the right of railway companies to exempt themselves from liability for damages caused by fire under the circumstances pertaining to this case? No better evidence has been brought to the attention of the court upon this subject than that afforded by the decision of the supreme court of the state in the Griswold Case; and, relying upon that decision, I hold that the contract contained in the lease to Simpson, McIntire & Co., exempting the defendant company from liability for fire, is not contrary to the public policy of the state of Iowa, and hence is not invalid. The demurrer to the answer is therefore overruled.