IN THE

# SUPREME COURT OF TENNESSEE

FOR THE

## MIDDLE DIVISION.

## DECEMBER TERM, 1920.

NASHVILLE RY. & LIGHT CO. *v.* J. B. LAWSON.

*(Nashville.* December Term, 1920.)

1. **INJUNCTION.** Bill on information and belief generally insufficient on motion to dissolve when answer is sworn to on defendant's knowledge.

As a general rule, an injunction bill, sworn to on information and belief, is inadequate to withstand a motion to dissolve an injunction, when the answer is sworn to positively and directly on defendant's personal knowledge. (*Post, p.* 85.)

Cases cited and approved: Reid v. Hoffman, 53 Tenn., 440; Smith v. Republic Life Insurance Co., 2 Tenn., Ch., 632.

2. **INJUNCTION.** Bill on knowledge, information, and belief sufficient on motion to dissolve when it affirmatively appears which allegations are on knowledge.

A bill sworn to on knowledge, information, and belief is sufficient to support an injunction attacked only on the ground of insufficiency of the affidavit, where it affirmatively appears from the face of the bill which allegations are based on knowledge and which on information and belief. (*Post, p.* 85.)

(78)

Nashville Ry. & Light Co. v. Lawson.

3. **INJUNCTION.** Bill on knowledge, information, and belief held sufficient on motion to dissolve.

A bill, filed by a street railway company, alleging agreements by its employees not to join any labor union during the term of their service, and alleging that defendant was engaged in an effort to induce them to break their contracts by joining a union, *held* sufficient, on motion to dissolve an injunction, though sworn to on knowledge, information, and belief and though the answer was sworn to positively on defendant's personal knowledge. (*Post*; *pp.* 86, 87.)

4. **CONTRACTS.** Contracts not to join labor union not contrary to ''public policy.''

Contracts between a street car company and its employees, whereby they agreed not to join any labor union during the term of their service, not violating any provision of the State or federal constitution or statutes or any rule of the common law, are not contrary to "public policy" which means that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good (quoting Words and Phrases, Public Policy). (*Post, pp.* 87-96).

Cases cited and approved: People v. Hawkins, 157 N. Y., 1; Smith v. Railway Co., 115 Cal., 594; Adair v. United States, 208 U. S., 161; Coppage v. Kansas, 236 U. S., 1;

Cases cited and distinguished: Swann v. Swann. (C. C.), 21 Fed., 301; Hartford Fire Ins. Co. v. Chicago, etc., Railway (C. C.), 62 Fed., 904; Vidal et al. v. Girard's Ex'rs, 2 How., 197; St. Louis Mining Co. v. Montana Mining Co., 171 U. S., 655; License Tax Case, 5 Wall., 469; Clark v. Railway, 123 Tenn., 232; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S., 235; Adair v. United States, 208 U. S., 161.

5. **CONTRACTS.** Report of War Labor Conference Board held not to render agreement not to join union void; ''shall.''

The report of the National War Labor Conference Board, officially published as presenting the position of the administration, and providing that the right of workers to organize trade unions and to bargain collectively "shall" not be denied, etc., and that employers should not discharge workers for membership in trade unions, does not invalidate agreements by employees not to join a union, or render them contrary to public policy, as "shall" is used in the sense of "should." (*Post, pp.* 96-99.)

FROM DAVIDSON.

Appeal from the Chancery Court of Davidson County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.—HON. JAS. B. NEWMAN, Chancellor.

J. M. ANDERSON and F. M. BASS, for plaintiff.

PITTS & McCONNICO and M. S. ROSS, for respondent.

MR. JUSTICE HALL delivered the opinion of the Court.

The bill in this cause was filed in the chancery court of Davidson county, by the complainant, a public service corporation, having its *situs* in the City of Nashville, Tenn., and operating an electric railway system and an electric light and power plant in said city and suburban territory, serving many hundreds of people, against the defendant, J. B. Lawson, individually, and as the agent and representative of the Amalgamated Association Street & Electric Railway Employees of America, an unincorporated street car labor union, with its headquarters located in Detroit, Mich., for the purpose of enjoining the said Lawson, both individually, and as representative of said association, his agents, etc., and all those in conspiracy and confederation with him, from undertaking to persuade the complainant's motormen and conductors to join the street car labor union, which the bill alleged said Lawson was then in Nashville for the purpose of organizing.

The bill further alleged that complainant had entered into separate written contracts with each of its motormen and conductors, for a period of two years from the date

of their execution, which provides, among other things, .as follows:

"3. Said employee further agrees as follows:

" '(a) That at this time he is not a member of any street car or other labor union, and he agrees that during the term of his services he will not join any such union.' "

It was further provided in said contracts that complainant, without just legal cause, would not dismiss any of its motormen or conductors until it gave such motorman or conductor two weeks' notice thereof in writing and said motormen and conductors, upon their part, agreed not to quit the employment of the complainant except after two weeks' notice of their intention so to do given in writing to the complainant.

The bill further alleged, as an affirmative fact, that, at the time of its filing, the defendant Lawson was actually engaged in an effort to so organize the motormen and conductors of the complainant; that in the effort to carry out his purposes the defendant had held interviews with certain of complainant's motormen and conductors; had endeavored to induce them to breach their contracts of employment with complainant by joining, or agreeing to join, said subordinate labor union, which he was endeavoring to organize; that he had an engagement on the night of the day on which the bill was filed to meet still other of complainant's conductors and motormen for the purpose of inducing them to breach their contracts of employment by agreeing to join said labor union; that the defendant had promised and agreed that as soon as a sufficient number of motormen and conductors agreed to join said union, he would procure a charter for said local union from said superior association, and

that he would organize complainant's employees into a local union under said charter.

The bill was sworn to by B. C. Edger, general superintendent of the complainant, it being stated in the affidavit " that the matters and things stated in the bill are true to the best of his knowledge, information and belief."

An injunction was issued in accordance with the prayer of the bill upon the *fiat* of the chancellor.

The defendant answered the bill. The answer admitted the execution of the written contracts with complainant by its motormen and conductors; admitted that the defendant was a nonresident at the time the bill was filed, but was temporarily in Davidson county at said time; that he was a member of the General Executive Board of the Amalgamated Association Street & Electric Railway Employees of America; admitted that he, at the invitation of a number of the employees of the complainant, came to Nashville on April 20, 1918, for the purpose of explaining to those employees and such others as might desire such information, both individually and collectively, the advantages and obligations that would result to them should they see fit to form a local organization in Nashville; that it was his purpose to present to said employees, in a decent and orderly manner, the aims, aspiration, and advantages or organized labor having to do with the welfare of street railway employees, with a view of having them decide, each man for himself, whether he would then, or at any future time, make application for membership in such organization.

Nashville Ry. & Light Co. v. Lawson.

The answer denied that it was defendant's purpose to, or that he was undertaking to persuade or induce any of the employees of the complainant to, violate their contracts with complainant, but the answer averred that it was defendant's purpose to advise the keeping of such contracts, and stated that it was his purpose, in a decent, orderly, and lawful manner, to explain the benefits and advantages of organized labor.

The answer was sworn to by the defendant, the affidavit stating that—"All matters and things therein stated are true as of his knowledge except where the text of the answer may show that the averment is made upon information and belief, in which event the defendant makes oath that he believes such matters and things to be true."

Later the defendant amended his answer by averring that complainant had entered into new contracts with its motormen and conductors on June 8 and 9, 1918, and that said new contracts contained a provision identical with the provision in the old contracts as to membership in or joining any labor union while in the service of complainant, and it was averred that said contracts were contrary to public policy and void.

The cause was heard upon the motion of the defendant to dissolve the injunction upon the bill and answer, and to modify the injunction. The chancellor refused to dissolve the injunction upon the bill and answer, but did modify said injunction in so far as it enjoined the defendant Lawson from "presenting in an orderly and peaceable manner to said employees, or any of them, the object and purposes of organized labor, and the advantages and benefits thereof."

The complainant excepted to this modification of the injunction. After thus disposing of the motion to dissolve the injunction upon the bill and answer, the court dissolved the injunction in its entirety upon the ground that the contracts, which complainant had with its motormen and conductors hereinbefore set out, were void because in contravention of the business policy of the government, and for that reason the bill could not be sustained, and it was dismissed, at complainant's cost.

From this latter decree complainant appealed to the court of civil appeals, and assigned errors.

The defendant filed the record for writ of error, and assigned the action of the chancellor overruling his motion to dissolve the injunction upon the bill and answer for error.

The court of civil appeals overruled the defendant's assignment of error, and affirmed the chancellor's decree refusing to dissolve the injunction upon the bill and answer, but reversed the decree of the chancellor, in so far as it adjudged that complainant's contracts with its employees were contrary to public policy and void and that the bill should be dismissed; and remanded the cause to the chancery court for further proceedings.

The defendant Lawson has filed his petition for writ of *certiorari,* and the cause is now before this court for review upon three assignments of error, which in reality raise but two questions:

First. That the court of civil appeals erred in not sustaining the defendant's assignment of error to the effect that the chancellor erred in denying his motion to dissolve the temporary injunction on the bill and answer without dismissing the bill.

Second. That the court of civil appeals erred in sustaining the complainant's assignment of error filed in that court, to the effect that the chancellor erred in adjudging that the provisions contained in the contracts of complainant with its employees, by which they obligated themselves not to join any labor union during the term of said contracts, were contrary to public policy and void, and in remanding the cause to the chancery court of Davidson county for further proceedings.

We will discuss these questions in the order in which they are presented in the petition, assignments of error, and brief accompanying same.

It is insisted that the injunction should have been dissolved upon the bill and answer, because the bill is sworn to on knowledge, information, and belief, while the averments, and denials of the answer, which are positive and direct, are sworn to as of the defendant's own knowledge, and, therefore fully met and overcame the illegations of the bill.

The general rule is well settled under our practice that an injunction bill, sworn to on information and belief, is inadequate to withstand a motion to dissolve an injunction when the answer is sworn to positively and directly on the personal knowledge of the defendant, but it is just as well settled that a bill sworn to on knowledge, information, and belief, where it affirmatively appears from the face of the bill what allegations are based on knowledge, and what on information and belief, is sufficient to support an injunction when it is attacked alone on the ground of the insufficiency of the affidavit. Gibson's Suits in Chancery, section 788; *Reid* v. *Hoffman,* 6 Heisk., 440; *Smith* v. *Republic Life Insurance Co.,* 2 Tenn. Ch., 632.

The bill in the instant cause clearly discloses what allegations were made on the knowledge of the affiant, and those on information and belief. It appears from the bill as an affirmative fact that complainant had contracts with its employees not to join labor unions while in its service, and that the defendant was actually engaged in an effort to induce, by persuasion, its employees to breach their contracts by joining a labor union, of which the defendant was a member and representative.

We think this allegation was sufficient to support the bill upon a motion to dissolve upon bill and answer.

Furthermore, while it is stated by Mr. Gibson, in section 851 of his Suits in Chancery, that ordinarily an injunction will be dissolved on bill and answer, where the answer verified is positive and direct and full in its details, based on defendant's own personal knowledge of the facts, it is expressly stated in section 852 that there are certain well-defined exceptions to this rule. These exceptions are:

(1) "Where the answer admits the equity of the bill and sets up new matter in avoidance."

(2) "Where the injunction is the real remedial part of the bill."

(3) "Where the dissolution of the injunction involves a decision of the cause on its merits."

(4) "Where the dissolution would be equivalent to a decision of the cause against the complainant."

We are of the opinion that there is no error in the action of the court of civil appeals in not sustaining the defendant's assignment of error with respect to the

chancellor's action upon the motion to dissolve the injunction upon the bill and answer.

The question remains. Was the court of civil appeals, in error in holding that the contracts of complainant with its motormen and conductors, by the terms of which said motormen and conductors obligated themselves not to join any street car or labor union during the term of such contracts, were not contrary to public policy and void?

In determining this question we must first determine what public policy is. In Words and Phrases, vol. 6 p. 5813, it is said:

"By public policy is intended that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed the policy of the law, or public policy in relation to the administration of the law."

In Beach on Contracts, vol. 2, section 1498, public policy is defined as follows: "By public policy is intended that principle of the law which holds that no citizen can lawfully do that which has a tendency to injure the public, or which is against the public good."

In Cyc. vol. 32, p. 1251, public policy is defined as follows:

"That principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public or against the public good; the principle that no one can lawfully do that which has a tendency to be injurious to the public or against the public good; the principles under which freedom of

contract or private dealing is restricted by law for the good of the community; the public good."

In *Swann* v. *Swann*, C. C.), 21 Fed., 301, it is said:

"Vague surmises and flippant assertions as to what is the public policy of the State, or what would be shocking to the moral sense of its people, are not to be indulged in. The law points out the sources of information to which courts must appeal to determine the public policy of a State. The term, as it is often popularly used and defined, makes it an unknown and variable quantity—much too indefinite and uncertain to be made the foundation of a judgment. The only authentic and admissible evidence of the public policy of a State on any given subject are its constitution, laws, and judicial decisions. The public policy of a State, of which courts take notice, and to which they give effect, must be deduced from these sources."

In H*artford Fire Insurance Co.* v. *Chicago, etc., Railway* (C. C.), 62 Fed., 904, the court said:

"The real question for consideration is, how shall it be determined whether the contract is or is not contrary to public policy? The subject-matter of the contract may be such that it affects the country at large, or it may be local in its nature. The nature of the subject-matter determines the source from which light must be sought upon the question of fact whether the provisions of a given contract are or are not contrary to public policy. In other words, there is a public policy of the nation, applicable to all matters wherein the people at large are interested, including those committed to the control of the national government, and coextensive with the bound-

Nashville Ry. & Light Co. v. Lawson.

aries of the Union, and also a State, public policy adapted to the circumstances of the locality embraced within the boundaries of the State, and applicable to all matters within State control. Thus, in Greenhood on Public Policy, it is said that any contract made by a competent party, upon valuable consideration, is valid, unless it binds the maker to do something opposed to the public policy of the State or nation. Greenh, Pub. Pol., p. 1, rules 1 and 2. In seeking to ascertain the requirements of the public policy of the nation, the principal source of information are the constitution of the United States, the statutes enacted by Congress, and the decisions of the courts, federal and State; and in case there should be a divergence in views of the federal and State courts upon a question of national public policy, the conclusion reached in the federal courts must be accepted as the best evidence of what the requirements of the national public policy are. On the other hand, when seeking to determine the public policy of the State towards a subject within State control, the principal sources of information are the State constitution and statutes and the decisions of the courts, State and federal; and, in case of a divergence between them, the decisions of the State court must be accepted as the best evidence of the public policy of the State.''

This case was affirmed on appeal to the United States circuit court of appeals, and is reported in 70 Fed., 201, 17 C. C. A., 62, 30 L. R. A., 193. It was then carried from the circuit court of appeals to the supreme court of the United States, where the judgment of the circuit court of appeals, affirming the judgment of the circuit court,

was affirmed. 175 U. S., 91, 20 Sup. Ct., 33, 44 L. Ed., 84. The supreme court, speaking upon the question of public policy, said:

"Questions of public policy, as affecting the liability for acts done, or upon contracts made and to be performed, within one of the States of the Union—when not controlled by the constitution, laws, or treaties of the United States, or by the principles of the commercial or merchantile law or of general jurisprudence, of national or universal application, are governed by the law of the State as expressed in its own constitution and statutes, or declared by its highest court."

In *Vidal et al.* v. *Girard's Ex'rs*, 2 How. 197, 11 L. Ed., 234, Mr. Justice STORY, speaking for the court said:

"The question, what is the public policy of a State, and what is contrary to it, if inquired into beyond these limits, will be found to be one of great vagueness and uncertainty, and to involve discussions which scarcely come within the range of judicial duty and functions, and upon which men may and will complexionally differ; above all, when that topic is connected with religious polity, in a country composed of such a variety of religious sects as our country, it is impossible not to feel that it would be attended with almost insuperable difficulties, and involve differences of opinion almost endless in their variety. We disclaim any right to enter upon such examinations, beyond what the State constitutions, and laws and decisions necessarily bring before us."

In *St Louis Mining Co.* v. *Montana Mining Co.*, 171 U. S., 655, 19 Sup. Ct., 61, 43 L. Ed., 320, the court said:

"The public policy of the government is to be found in the constitution and the laws, and the course of administration and decisions."

In *License Tax Case,* 5 Wall., 469, 18 L. Ed., 497, the court said:

"This court can know nothing of public policy except from the constitution and the laws, and the course of administration and decision. It has no legislative powers. It cannot amend or modify any legislative acts. It cannot examine questions as expedient or inexpedient, as politic or impolitic. Considerations of that sort must, in general, be addressed to the legislature. Questions of policy determined there are concluded here.

"There are cases, it is true, in which arguments drawn from public policy must have large influence; but these are cases in which the course of legislation and administration do not leave any doubt upon the question what the public policy is, and in which what would otherwise be obscure or of doubtful interpretation, may be cleared and resolved by reference to what is already received and established.

The cases before us are not of this sort. The legislature has thought fit, by enactments clear of all ambiguity, to impose penalties for unlicensed dealing in lottery tickets and in liquors. These enactments, so long as they stand unrepealed and unmodified, express the public policy in regard to the subjects of them. The proposition that they are contrary to public policy is therefore a contradiction in terms, or it is intended as a denial of their expediency or their propriety. If intended in the latter sense, the proposition is one of which courts cannot take cognizance."

In accord with the decisions above cited are the cases of *People* v. *Hawkins,* 157 N. Y., 1, 51 N. E., 257, 42 L. R. A., 490, Am. St. Rep., 736; *Smith* v. *Railway* Co., 115 Cal., 584, 47 Pac., 582, 35 L. R. A., 309, 56 Am. St. Rep., 130.

In *Clark* v. *Railway,* 123 Tenn., 232, 130 S. W., 751, this court, speaking through Shief Justice NEIL, said:

"Any power attempted to be exercised under a foreign statutes or character that violates a statute of the State, where it is sought to be used, or of the United States, or that is contrary to the settled decisions of the highest court of the State, is against public policy. These are the sources from which public policy must be learned, along with the practice of the executive departments of the State government. Mere silence upon the subject in statutes or decisions may be sufficient to indicate that the matter is not against public policy where it is not against good morals."

The contracts hereinbefore quoted do not violate any provisions of the constitution of the United States or of the State. They do not conflict with any federal or State statute. Neither do they violate any rule of the common law.

In December, 1917, the supreme court of the United States decided a similar question in the case of *Hitchman Coal & Coke Co.* v. *Mitchell,* which is reported in 245 U. S., 235, 38 Sup. Ct., 65, 62 L. Ed., 260, L. R. A., 1918C, 497, Ann. Cas., 1918B, 461.

In that case the complainant was a mining corporation, and for reasons which it deemed justifiable and expedient, it decided to employ in its mine only non-

Nashville Ry. & Light Co. v. Lawson.

union men. In pursuance of this decision it entered into an agreement with each and all of its employees that so long as they worked for said company they could not become members of any miners' union, and that said company would not retain in its employ any man who became a member of such union. The defendant Mitchell and others, having failed to induce the operators to unionize their mine, were seeking in public and private meetings, by persuasion, threats, and other methods, to induce said company's employees to become members of the union. A bill was filed, a temporary injunction issued, enjoining defendants from procuring, or undertaking to procure, complainant's employees to join, or to agree to join, any labor union in violation of their contracts, and on final hearing this injunction was made perpetual. Mr. Justice PITNEY, in delivering the opinion of the court, said:

"That the plaintiff was acting within its lawful rights in employing its men only upon terms of continuing nonmembership in the United Mine Workers of America is not open to question. Plaintiff's repeated costly experiences of strikes and other interferences while attempting to 'run union' were a sufficient explanation of its resolve to run 'nonunion,' if any were needed. But neither explanation nor justification is needed. Whatever may be the advantage of 'collective bargaining,' it is not bargaining at all, in any just sense, unless it is voluntary on both sides. The same liberty which enables men to form unions, and through the union to enter into agreements with employers willing to agree, entitles other men to remain independent of the union, and other

employers to agree with them to employ no man who owes any allegiance or obligation to the union. In the latter case, as in the former, the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make. This court repeatedly has held that the employer is as free to make non-membership in a union a condition of employment as the working man is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power. *Adair* v. *United States,* 208 U. S., 161, 174, 52 L. Ed., 436 442, 28 Sup. Ct. Rep., 277, 13 Ann. Cas., 764; *Coppage* v. *Kansas,* 236 U. S., 1, 14, 59 L. Ed., 441, 446, L. R. A., 1915C, 960, 35 Sup. Ct. Rep., 240. In the present case, needless to say, there is no act of legislation to which defendants may resort for justification.

"Plaintiff, having in the exercise of its undoubted rights, established a working agreement between it and its employees, with the free assent of the latter, is entitled to be protected in the enjoyment of the resulting *status,* as in any other legal right. That the employment was 'at will,' and terminable by either party at any time, is of no consequence."

In the case of *Adair* v. *United States,* 208, U. S., 161, 28 Sup. Ct., 277, 52 L. Ed., 436, 13 Ann. Cas., 764, it was held that the tenth section of the act of 1898 (30 Stat., 424), passed by the Congress, making it a criminal offense against the United States for an agent or officer of an interstate carrier, having full authority in the premises

from the carrier, to discharge an employee from service because of his membership in a labor organization, was repugnant to the Fifth Amendment of the constitution of the United States, declaring that no person should be deprived of his liberty or property without due process of law.

Mr. Justice HARLAN, in delivering the opinion of the court, said:

"It was the right of the defendant to prescribe the terms upon which the services of Coppage would be accepted, and it was the right of Coppage to become or not, as he chose, an employee of the railroad company upon the terms offered to him. Mr. Cooley, in his treatise, on Torts, p. 278, well says: 'It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern. It is also his right to have business relations with any one with whom he can make contracts, and if he is wrongfully deprived of this right by others, he is entitled to redress.' "

Mr. Justice HARLAN then sums up the case as follows:

"It results, on the whole case, that the provision of the statute under which the defendant was convicted must be held to be repugnant to the Fifth Amendment, and as not embraced by nor within the power of Congress to regulate interstate commerce, but under the guise of regulating interstate commerce, and as applied to this case it arbitrarily sanctions an illegal invasion of the personal

liberty as well as the right of property of the defendant Adair.''

A similar section in the statute passed by the Legislature of the State of Kansas was declared unconstitutional by the supreme court in the case of *Coppage* v. *Kansas*, 236, U. S., 1, 35 Sup. Ct., 240, 59 L. Ed., 441, L. R. A., 1915C, 960. In that case the holding in the case of *Adair* v. *United States* was cited and approved.

But it is insisted by counsel for the defendant in the case at bar that the complainant's contracts with its employees are void on account of the provisions hereinbefore referred to, for the reason that said provisions conflict with the report of the National War Labor Conference Board, and the proclamation of the President thereon. The report of the National War Labor Conference Board under the heading ''Right to Organize'' contains the following:

''1. The right of workers to organize in trade unions and to bargain collectively through chosen representatives is recognized and affirmed. This right shall not be denied, abridged or interfered with by the employers in any manner whatsoever.

''2. The right of employees to organize their association or groups, and to bargin collectively through chosen representatives, is recognized and affirmed. This right shall not be denied, abridged or interfered with by the workers in any manner whatsoever.

''3. Employers should not discharge workers for membership in trade unions, nor for legitimate trade union activities.''

It would seem that the chancellor, in dissolving the injunction and dismissing the bill, based his action solely upon the provisions of the foregoing report, and the proclamation of the President thereon; and the argument made by counsel for the defendant, to the effect that the provisions of the contracts are against public policy, is based largely upon said report and the proclamation of the President thereon.

The official pamphlet in which the report of the National War Labor Conference Board, together with the proclamation of the President made thereon, was issued by the United States Department of Labor, and on the back thereof appears the following:

"National War Labor Program.

"This contains a copy of the proclamation of the President of the United States creating the National War Labor Board, together with copy of report of the board, to which the proclamation refers. In addition will be found names of the members of the board and other details.

"This report presents the position of the administration relative to the attitude which should be taken by employers and employees during the war."

We think it is well settled by the decisions above cited that, prior to the publication of the report of the National War Labor Board,, and the proclamation of the President an employer had the right to employ non-union workers, and to contract with them that they would not become members of labor unions during their term of employment. Upon reading the report and the proclamation together, we are of the opinion that they do not

144 Tenn.—7

undertake to denounce contracts, such as the complainant has with its employees, as void, because against public policy.

In our opinion both the report and the proclamation of the President are in the nature of a request rather than a command. It is true that in section 1 of the provisions under the head of "Right to Organize" it is said that the right "shall not be denied." etc., but in section 3, under the same heading, it is said that employers "should" not discharge workers, etc. We think that the word "shall" in said first section is used in the sense of "should." In addition to the above, the President, in his proclamation, does not command that employers and employees utilize the means and methods provided for the adjustment of differences, but he "urges" upon them to do so.

We think that the real purpose of the creation of the War Labor Conference Board, its report, and the proclamation of the President thereon, was to provide a method that might be used, at will, by employers and employees alike in the settlement of differences between them. Neither the employers nor employees were compelled to submit their differences to said board, or any agency provided by it. In any event, there is nothing in said report or proclamation that undertakes to prevent employees from voluntarily contracting with their employers not to join a labor union during the contracted term of service.

The bill alleges that the contracts in question were voluntarily entered into by its employees, and that there had been no effort upon their part to breach said con-

tracts, but the effort to induce them to do so was being made by the defendant, who is a stranger to said contracts.

It is said that the injunction should not have been granted, because the bill does not allege the use of force, threats, or violence by the defendant to have complainant's employees breach their contracts, and that it is not unlawful to use peaceable means, such as persuasion, to induce said employees to breach their contracts, by joining the union represented by the defendant.

We think this contention is expressly decided adversely to the defendant in the case of *Hitchman Coal & Coke Co.* v. *Mitchell, supra.*

There is no error in the decree of the court of civil appeals, and it is affirmed with costs.